# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | **Case No. 2:23-cv-5023** |
| ) | |
| v. ) | **STIPULATED ORDER FOR** |
| ) | **PERMANENT INJUNCTION AND** |
| RITE AID CORPORATION, a corporation, ) | **OTHER RELIEF** |
| and, ) | |
| ) | |
| RITE AID HDQTRS. CORP., a corporation, ) | |
| ) | |
| Defendants. ) | |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), filed its Complaint for Permanent Injunction and Other Relief ("Complaint") pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), against Defendants Rite Aid Corporation and Rite Aid Hdqtrs. Corp. Defendants have waived service of the summons and the Complaint.

Defendants Rite Aid Corporation and Rite Aid Hdqtrs. Corp. filed petitions for relief under Chapter 11 of the Bankruptcy Code on October 15, 2023. *See In re Rite Aid Corporation*, Case No. 3:23-bk-18993 (Bankr. D.N.J.); *In re Rite Aid Hdqtrs. Corp.*, Case No. 3:23-bk-18999 (Bankr. D.N.J.) (collectively, the "Bankruptcy Cases"). These cases are being jointly administered in the lead case, *In re Rite Aid Corporation*, Case No. 3:23-bk-18993 (Bankr. D.N.J.) (the "Bankruptcy Court").

Plaintiff and Defendants stipulate to the entry of this Order for Permanent Injunction and Other Relief ("Stipulated Order") to resolve all matters in dispute in this action between them. Defendants shall seek approval from the Bankruptcy Court to enter this Stipulated Order.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1.      This Court has jurisdiction over this matter.

2.      Venue is proper as to all parties in this District.

3.      The Complaint charges Defendants with unfair acts or practices in violation of Sections 5(a) and 5(n) of the FTC Act, 15 U.S.C. §§ 45(a), (n), in connection with their (1) facial recognition technology practices and (2) failure to implement or maintain a comprehensive information security program in violation of Part II of the Commission's Decision and Order in *In re Rite Aid Corporation*, C-4308, 150 F.T.C. 694 (Nov. 12, 2010) ("2010 Decision and Order").  Defendants are thus subject to relief under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

4.      Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Stipulated Order and the Decision and Order set forth in Attachment A, and agree to bear their own costs and attorney fees.

5.      Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Stipulated Order or in the Decision and Order set forth in Attachment A.  Only for purposes of this action, Defendants admit the facts necessary to establish jurisdiction.

6.      Defendants and Plaintiff waive all rights to appeal or otherwise challenge or contest the validity of this Stipulated Order or the Decision and Order set forth in Attachment A.

7.      The Plaintiff's commencement and prosecution of this action are actions to enforce the Plaintiff's police or regulatory power.  As a result, if the Bankruptcy Cases are

pending as of the date of entry of this Order, these actions are excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4).

## DEFINITIONS

"**Defendant(s)**" means Rite Aid Corporation, Rite Aid Hdqtrs Corp., and all of their subsidiaries, divisions, successors and assigns, individually, collectively, or in any combination.

## I.      ORDERS OF BANKRUPTCY COURT

IT IS FURTHER ORDERED that this Order does not restrain or enjoin the deposit, exchange, distribution, investment, or withdrawal of assets owned or held by Defendants and being administered in accordance with the United States Bankruptcy Code and orders of the Court in the Bankruptcy Cases.  For the avoidance of doubt this Stipulated Order does not create a contingent liability against the Defendants and does not preclude the full distribution of assets held by the Defendants in the Bankruptcy Cases.

## II.      MODIFICATION OF 2010 DECISION AND ORDER

IT IS FURTHER ORDERED that Defendants:  (i) consent to reopening of the proceeding in FTC Docket No. C-4308; (ii) waive their rights under the show cause procedures set forth in Section 3.72(b) of the Commission's Rules of Practice, 16 C.F.R. § 3.72(b); and (iii) consent to modification of the 2010 Decision and Order in *In re Rite Aid Corporation,* C-4308, 150 F.T.C. 694 (Nov. 12, 2010), with the Commission order in Attachment A, which shall replace and supersede the 2010 Order.

### III.   CONTINUING JURISDICTION

IT IS FURTHER ORDERED that this Court shall retain jurisdiction in this matter for

purposes of construction, modification, and enforcement of this Stipulated Order.

SO ORDERED this 23rd day of February, 2024.

/s/ Hon. Kelley B. Hodge
_____
UNITED STATES DISTRICT JUDGE

**SO STIPULATED AND AGREED:**

Dated: December 19, 2023                    **FOR THE FEDERAL TRADE COMMISSION**

JAMES A. KOHM                              BENJAMIN WISEMAN
Associate Director                         Associate Director
Division of Enforcement                    Division of Privacy and Identity Protection

LAURA KOSS                                 TIFFANY GEORGE
Assistant Director                         Assistant Director
Division of Enforcement                    Division of Privacy and Identity Protection

                                           /s/ Robin L. Wetherill
CHRISTOPHER J. ERICKSON                     ROBIN WETHERILL
Attorney                                   Attorney
Division of Enforcement                    Division of Privacy and Identity Protection

BRIAN M. WELKE                             LEAH FRAZIER
Attorney                                   Attorney
Division of Enforcement                    Division of Privacy and Identity Protection

                                           N. DIANA CHANG
Federal Trade Commission                   Attorney
600 Pennsylvania Avenue,                   Division of Privacy and Identity Protection
N.W. Mail Stop CC-6316
Washington, D.C. 20580                     Federal Trade Commission
(202) 326-3671 (Erickson); - 2897 (Welke)  600 Pennsylvania Avenue,
cerickson@ftc.gov; bwelke@ftc.gov          N.W. Mail Stop CC-6316
                                           Washington, D.C. 20580
                                           (202) 326-2220 (Wetherill); - 2187
                                           (Frazier); (415) 848-5100 (Chang)
                                           rwetherill@ftc.gov; lfrazier@ftc.gov;
                                           nchang@ftc.gov

Dated: December 13, 2023

**FOR DEFENDANT RITE AID CORPORATION**

Jeffrey S. Stein
Chief Executive Officer
Rite Aid Corporation

Dated: December 13, 2023

**FOR DEFENDANT RITE AID HDQTRS. CORP.**

Jeffrey S. Stein
Chief Executive Officer
Rite Aid Hdqtrs. Corp.

Dated: December 14, 2023

*Mark S. Melodia*

ANTHONY E. DIRESTA
MARK S. MELODIA
Holland & Knight LLP
800 17th Street N.W.
Suite 1100
Washington, D.C. 20006
(202) 955-3000
Anthony.DiResta@hklaw.com
Mark.Melodia@hklaw.com

RICHARD H. CUNNINGHAM
Kirkland & Ellis LLP
1301 Pennsylvania Ave. N.W.
Washington D.C. 20004
(202) 389-3119
Richard.Cunningham@kirkland.com

ALLISON W. BUCHNER
Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
(310) 552-4302
Allison.Buchner@kirkland.com

*Counsel for Defendants Rite Aid Corporation and Rite Aid Hdqtrs. Corp.*

# Attachment A

0723121

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:      **Lina Khan, Chair**
**Rebecca Kelly Slaughter**
**Alvaro M. Bedoya**

| | |
|---|---|
| **In the Matter of** | **DECISION AND ORDER** |
| **RITE AID CORPORATION,** a corporation, and | **DOCKET NO. C-4308** |
| **RITE AID HDQTRS. CORP.,** a corporation. | |

**DECISION**

The Federal Trade Commission ("Commission") initiated an investigation of certain acts and practices of Respondents named in the caption. The Commission's Bureau of Consumer Protection ("BCP") prepared and furnished to Respondents a draft Complaint. BCP proposed presenting the draft Complaint to the Commission for its consideration. If issued by the Commission, the draft Complaint would charge the Respondents with violations of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a), (n), and 53(b), including by violating the Commission's 2010 Decision and Order in the above-captioned matter.

Respondents neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Decision and Order. For purposes of this action only, Respondents admit the facts necessary to establish jurisdiction.

The Commission considered the matter and determined that it had reason to believe that Respondents have violated the Federal Trade Commission Act and the Decision and Order the Commission previously issued in *In re Rite Aid Corporation*, C-4308, 150 F.T.C. 694 (Nov. 12, 2010), and that a Complaint should issue stating its charges in that respect. After due consideration, the Commission issues the Complaint, makes the following Findings, and issues the following Order:

**Findings**

1. The Respondents are:

> a. Rite Aid Corporation, a Delaware corporation with its principal office or place of business at 1200 Intrepid Avenue, 2nd Floor, Philadelphia, PA 17011; and
>
> b. Rite Aid Hdqtrs. Corp., a Delaware corporation with its principal office or place of business at 1200 Intrepid Avenue, 2nd Floor, Philadelphia, PA 17011.

2. The Commission has jurisdiction over the subject matter of this proceeding and over the Respondents, and the proceeding is in the public interest.

3. The Complaint charges violations of Section 5 of the FTC Act, 15 U.S.C. § 45, including by violating Provision II of an order previously issued by the Commission.

4. Respondents waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear its own costs and attorney fees.

5. Respondents and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## ORDER

### Definitions

For purposes of this Order, the following definitions apply:

A. "Affirmative Express Consent" means any freely given, specific, informed, and unambiguous indication of an individual consumer's wishes demonstrating agreement by the individual, such as by a clear affirmative action, following a Clear and Conspicuous disclosure to the individual of: (i) the categories of information that will be collected; (ii) the specific purpose(s) for which the information is being collected; (iii) the names or categories of Third Parties collecting the information, or to whom the information is disclosed, provided that if Respondent discloses the categories of Third Parties, the disclosure shall include a hyperlink or information about how to access a separate page listing the names of the Third Parties; (iv) a simple, easily-located means by which the consumer can withdraw consent; and (v) any limitations on the consumer's ability to withdraw consent. The Clear and Conspicuous disclosure must be separate and apart from any "privacy policy," "terms of service," "terms of use," or other similar document, but it may reference them.

The following do not constitute Affirmative Express Consent:

1. Inferring consent from the hovering over, muting, pausing, or closing of a given piece of content by the consumer; or

2. Obtaining consent through a user interface that has the effect of subverting or impairing user autonomy, decision-making, or choice.

2

B. "Automated Biometric Security or Surveillance System" means any machine-based system, including any computer software, application, or algorithm, that analyzes or uses Biometric Information of, from, or about individual consumers to generate an Output that relates to those consumers, notwithstanding any assistance by a human being in such analysis or use, and that is used in whole or in part for a Security or Surveillance Purpose. *Provided, however,* that the term "Automated Biometric or Surveillance Security System" as used in this Order does not include:

1. A camera or similar sensor that is used to capture images or videos of individuals that are not collected or used in connection with the generation of an Output;

2. Any system to the extent that it is used to authenticate or identify Respondents' employees, contractors, or agents in connection with the performance of their job duties, so long as Respondents receive Affirmative Express Consent for the collection and use of any Biometric Information in connection with such authentication; and

3. Any system to the extent it is used exclusively in the direct provision of medical services by or under the supervision of a physician, registered nurse, pharmacist, or other licensed health care professional, so long as Respondents receive Affirmative Express Consent for the collection and use of any Biometric Information in connection with such system.

C. "Biometric Information" means data that depict or describe physical, biological, or behavioral traits, characteristics, or measurements of or relating to an identified or identifiable person's body, including depictions or images, descriptions, recordings, or copies of an individual's facial or other physical features (e.g., iris/retina scans), finger or handprints, voice, genetics, or characteristic movements or gestures (e.g., gait or typing pattern). "Biometric Information" does not include data that relates solely to user accounts or credentials, such as a username, or to user devices, such as device IDs or IP addresses, in isolation from data that depict or describe or are used to infer physical, biological, or behavioral traits, characteristics, or measurements of or relating to a person's body.

D. "Clear(ly) and Conspicuous(ly)" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

2. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

3. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

4. The disclosure must use diction and syntax understandable to ordinary consumers and  must appear in English, Spanish, and each other language in which a Covered Business provides signage or other disclosures in the physical location or on the website where the disclosure appears.

5. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

6. The disclosure must not be contradicted or mitigated by, or inconsistent with, any other statements or representations in or near the disclosure.

7. When the deployment of an Automated Biometric Security or Surveillance System targets a specific group, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

E. "Covered Business" means (1) any Respondent; (2) any business of which one or more Respondents is a majority owner or controls, directly or indirectly.

F. "Covered Incident" means any incident that results in a Covered Business notifying, pursuant to a statutory or regulatory requirement, any U.S. federal, state, or local government entity that information of or about an individual consumer was, or is reasonably believed to have been, accessed, acquired, or publicly exposed without authorization.

G. "Covered Information" means information from or about an individual consumer, including: (a) a first and last name; (b) a home or physical address; (c) an email address or other online contact information, such as an instant messaging user identifier or a screen name; (d) a mobile or other telephone number; (e) a driver's license or other government-issued identification number; (f) date of birth; (g) geolocation information sufficient to identify street name and name of a city or town; (h) bank account information or credit or debit card information (including a partial credit or debit card number with more than five digits); (i) user identifier, or other persistent identifier that can be used to recognize a user over time and across different devices, websites, or online services; (j) user account credentials, such as a login name and password (whether plain text, encrypted, hashed, and/or salted); (k) Biometric Information; or (*l*) Health Information.

H.  "Facial Recognition or Analysis System" means an Automated Biometric Security or Surveillance System that analyzes or uses depictions or images, descriptions, recordings, copies, measurements, or geometry of or related to an individual's face to generate an Output.

I.  "Gallery" means a collection, database, or list of samples of Biometric Information created and retained for purposes of comparison with other samples in connection with the use of an Automated Biometric Security or Surveillance System to generate an Output.

J.  "Health Information" means individually identifiable information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.  It includes, but is not limited to, the following information relating to an individual:  (a) prescription information, such as medication and dosage; (b) prescribing physician name, address, and telephone number; (c) health insurer name, insurance account number, or insurance policy number; (d) information concerning medical- or health-related purchases; and (e) any information that is derived or extrapolated from information about an individual's activities, or pattern of activities, from which a determination is made that the individual has a health condition or is taking a drug.

K.  "Inaccurate Output" means an Output that is false, misleading, or incorrect and includes, to the extent that the Output of an Automated Biometric Security or Surveillance System is binary, (1) false positives or false acceptances and (2) false negatives or false rejections.

L.  "Output" means a match, alert, prediction, analysis, assessment, determination, recommendation, identification, calculation, candidate list, or inference that is generated by a machine-based system processing Biometric Information.

M.  "Operator" means an officer, employee, manager, contractor, service provider, or other agent of a Covered Business whose job duties include the operation or oversight of any aspect of an Automated Biometric Security or Surveillance System.

N.  "Respondents" mean Rite Aid Corporation, Rite Aid Hdqtrs Corp., and their subsidiaries, divisions, successors and assigns.

O.  "Security or Surveillance Purpose" means a purpose related to surveillance (including but not limited to tracking individuals' location or behavior without Affirmative Express Consent); the detection, deterrence, prediction, or investigation of theft, crime, fraud, or other misconduct; or access to locations, material goods, information, systems, or networks.

P.  "Vendor" means any person or entity that receives, maintains, processes, or otherwise is permitted access to Covered Information from, by, or at the direction of a Covered Business through its provision of services directly to a Covered Business.

## Provisions

## I.      Use of Facial Recognition or Analysis Systems Prohibited

**IT IS ORDERED** that Respondents, in connection with the activities of any Covered Business, are prohibited for five (5) years from the effective date of this Order from deploying or using, or assisting in the deployment or use of, any Facial Recognition or Analysis System, whether directly or through an intermediary, in any retail store or retail pharmacy or on any online retail platform.

## II.      Deletion of Covered Biometric Information

**IT IS FURTHER ORDERED** that Respondents; and Respondents' officers, agents, and employees; and all other persons in active concert or participation with any of them, who receive actual notice of this Order, must, unless prohibited by law:

A.  Within forty-five (45) days after the effective date of this Order, delete or destroy all photos and videos of consumers used or collected in connection with the operation of a Facial Recognition or Analysis System prior to the effective date of this Order, and any data, models, or algorithms derived in whole or in part therefrom, and provide a written statement to the Commission, sworn under penalty of perjury, confirming that all such information has been deleted or destroyed;

B.  Within sixty (60) days after the effective date of this Order, Respondents must:

   1.  Identify all third parties, other than government entities, that received photos and videos of consumers used or collected in connection with the operation of a Facial Recognition or Analysis System prior to the effective date of this Order, and any data, models, or algorithms derived in whole or in part therefrom from any Covered Business, provide a copy of the Complaint and Order to all such identified third parties, notify all such identified third parties in writing that the Federal Trade Commission alleges that Respondents used that information in a manner that was unfair in violation of the FTC Act, and instruct all such identified third parties to delete all photos and videos of consumers used or collected in connection with the operation of a Facial Recognition or Analysis System prior to the effective date of this Order, and any data, models, or algorithms derived in whole or in part therefrom, and demand written confirmation of deletion.  Defendant's instruction to each such identified third party shall include a description of the Biometric Information to be deleted.  Defendant must provide all instructions sent to the identified third parties to: DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of

Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580.  The subject line must begin: "In the Matter of Rite Aid;" and

2.  Provide all receipts of confirmation and any responses from third parties within ten (10) days of receipt to: DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580.  The subject line must begin: "In the Matter of Rite Aid."

### III.    Mandated Automated Biometric Security or Surveillance System Monitoring Program

**IT IS FURTHER ORDERED** that Respondents, in connection with the operation of any retail store or retail pharmacy or online retail platform by any Covered Business, must not use any Automated Biometric Security or Surveillance System in connection with Biometric Information collected from or about consumers of such retail store, retail pharmacy, or online retail platform, unless (1) use of the Automated Biometric Security or Surveillance System is not prohibited pursuant to Provision I of this Order entitled Use of Facial Recognition or Analysis Systems Prohibited; and (2) Respondents first establish and implement, and thereafter maintain, a comprehensive Automated Biometric Security or Surveillance System Monitoring Program (the "Program").  In establishing, implementing, and maintaining the Program, Respondents must identify and address risks that operation of the Automated Biometric Security or Surveillance System will result, in whole or in part, in physical, financial, or reputational harm to consumers,  stigma, or severe emotional distress, including in connection with communications of the Outputs to law enforcement or other third parties, and must also identify and address risks that any such harms will disproportionately affect consumers based on race, ethnicity, gender, sex, age, or disability, alone or in combination.  To satisfy this requirement, Respondents must:

A.  Document in writing the content, implementation, and maintenance of the Program;

B.  Designate a qualified employee or employees to coordinate and be responsible for the Program;

C.  For each Automated Biometric Security or Surveillance System used, prior to its implementation (or for any Automated Biometric Security or Surveillance System in use as of the effective date of this Order, within ninety (90) days of the effective date of this Order) and, thereafter, at least once every twelve (12) months, conduct a written assessment ("System Assessment") of potential risks to consumers from the use of the Automated Biometric Security or Surveillance System, including, at a minimum, risks that consumers could experience physical, financial, or reputational injury, stigma, or severe emotional distress in connection with Inaccurate Outputs of the Automated Biometric Security or Surveillance System (e.g., if the technology misidentifies a consumer).  The System Assessment must include a review of:

1. The consequences for consumers of Inaccurate Outputs of the Automated Biometric Security or Surveillance System, including actions that Respondents or others intend to or may foreseeably take in whole or in part as a result of such Outputs;

2. Any testing relating to the rate or likelihood of Inaccurate Outputs, the extent to which such testing was conducted using reliable methodologies and under conditions similar to those in which the Automated Biometric Security or Surveillance System will operate, and the results of such testing;

3. Any factors that are likely to affect the accuracy of the type of Automated Biometric Security or Surveillance System deployed, such as any characteristics of Biometric Information, of the context or method in which Biometric Information is captured, or of individuals whose Biometric Information is used in connection with the Automated Biometric Security or Surveillance System (e.g., skin tone or language or dialect spoken), that would increase or decrease the likelihood that its use in connection with the Automated Biometric Security or Surveillance System would result in Inaccurate Outputs;

4. The extent to which the specific components of the Automated Biometric Security or Surveillance System as deployed, including the specific types and models of any devices or software, that any Covered Business uses or will use to capture, transmit, or store Biometric Information could affect the likelihood that the Automated Biometric Security or Surveillance System produces Inaccurate Outputs;

5. Documentation and monitoring of the Automated Biometric Security or Surveillance System's accuracy that Respondents have conducted pursuant to sub-Provision III.D;

6. The extent to which the Automated Biometric Security or Surveillance System was developed to be used for a similar purpose and under similar conditions to those under which any Covered Business deploys or will deploy the Automated Biometric Security or Surveillance System;

7. The methods by which any algorithms comprising part of the Automated Biometric Security or Surveillance System were developed, including the extent to which such components were developed using machine learning or any other method that entails the use of datasets to train algorithms, and the extent to which these methods increase the likelihood that Inaccurate Outputs will occur or will disproportionately affect consumers depending on their race, ethnicity, gender, sex, age, or disability status. This review should include, at a minimum:

a. The sources and manner of collection of data that have been used to train or otherwise develop algorithmic components of the Automated Biometric Security or Surveillance System;

b. The extent to which the training data are materially similar to the Biometric Information that will be used in connection with deployment of the Automated Biometric Security or Surveillance System in light of factors that are known to affect the accuracy of the type of Automated Biometric Security or Surveillance System deployed; and

c. The makeup of any datasets that have been used to train or otherwise develop algorithmic components of the Automated Biometric Security or Surveillance System, including the extent to which the datasets have been representative, in terms of race, ethnicity, gender, sex, age, and disability status, of the population(s) of consumers whose Biometric Information will be used in connection with deployment of the Automated Biometric Security or Surveillance System;

8. The context in which the Automated Biometric Security or Surveillance System is or will be deployed, including the geographical locations of stores deploying the technology, demographic characteristics, including race and ethnicity, of areas surrounding stores where technology is deployed, physical location within stores or sections of stores, such as pharmacies, of system components, and the scale, timing and duration of the deployment (e.g., how long the system will be deployed and whether the system will operate continuously or only under certain circumstances);

9. All policies and procedures governing the operation of the Automated Biometric Security or Surveillance System and its software, algorithms, hardware, or other components;

10. The extent to which Operators receive sufficient and relevant training or are subject to oversight;

11. The extent to which the Automated Biometric Security or Surveillance System is likely to generate Inaccurate Outputs at a higher rate when analyzing or using Biometric Information collected from or about consumers of particular races, ethnicities, sexes, genders, ages, or who have disabilities (or any of these categories in combination), taking into account technical elements of the Automated Biometric Security or Surveillance System and any components thereof,  the selection of locations in which to deploy the Automated Biometric Security or Surveillance System, and the context or manner in which any Covered Business has deployed or will deploy the Automated Biometric Security or Surveillance System; and

9

12. The extent to which consumers are able to avoid the Automated Biometric Security or Surveillance System without losing access to any Covered Business's physical retail locations or online services, including by withholding Affirmative Express Consent for, or opting out of, the collection or use of their Biometric Information.

D. Implement, maintain, and document safeguards that are designed to control for the risks Respondents identify in the System Assessment. Each safeguard must be based on the severity of the risk to consumers and the likelihood that the risk could be realized. Such safeguards must also include:

1. Selecting and retaining service providers with duties related to the subject matter of this Order that are capable of performing those duties in a manner consistent with the Program and this Order, and contractually requiring such service providers to (1) comply with the requirements of the Program and this Order and (2) make available to Respondents all information and materials necessary to conduct the System Assessment;

2. Requiring and documenting regular and at least annual training for all Operators, which must cover, at a minimum:

   a. Methodologies for interpreting or assessing the validity of the Outputs of the Automated Biometric Security or Surveillance System, including for judging whether Outputs are Inaccurate;

   b. Evaluation of Biometric Information to determine its quality, value, and appropriateness for use in connection with the Automated Biometric Security or Surveillance System, particularly in light of each relevant factor identified pursuant to sub-Provision III.C.3 and the quality standards implemented pursuant to sub-Provision III.D.6.a;

   c. An overview of the types of human cognitive bias, such as automation bias and confirmation bias, that could foreseeably affect Operators' interpretations of the Outputs;

   d. Known limitations of the Automated Biometric Security or Surveillance System, including factors that are known to affect the accuracy of the Outputs of Automated Biometric Security or Surveillance Systems of the type deployed, such as image or sound quality, the method by which Biometric Information to be used in connection with the Automated Biometric Security or Surveillance System is collected, background images or sounds, the passage of time since the capture of a Biometric Information sample, or relevant demographic, physical, or other traits of the individual to whom Biometric Information pertains (such as race, ethnicity, sex, gender, age, or disability, alone or in combination); and

10

e. The requirements of this Order;

3. Documenting, for each Output, any Respondent's determination of whether the Output is Inaccurate and any actions that Operators take in whole or in part because of the Output;

4. Periodically, and at least annually, reviewing actions taken by any Operators in response to Outputs, updating the content of training for Operators to address systemic Operator errors identified by periodic reviews, and, if there is reason to believe that an Operator's operation of the Automated Biometric Security or Surveillance System increases risk to consumers, or if an Operator fails to comply with the requirements of this Order, terminating such Operator's operation of the Automated Biometric Security or Surveillance System;

5. Developing, implementing, and maintaining policies and procedures designed to ensure that Respondents have a reasonable basis for enrolling each consumer's Biometric Information in any Gallery;

6. Implementing and maintaining policies and procedures to ensure that samples of Biometric Information used in connection with the Automated Biometric Security or Surveillance System do not increase the likelihood of Inaccurate Outputs, including by:

   a. Developing, implementing, and enforcing written quality standards for Biometric Information to be used in connection with the Automated Biometric Security or Surveillance System, taking into account the nature of the Automated Biometric Security or Surveillance System, the manner in which the Biometric Information is captured, and characteristics of Biometric Information that could affect the accuracy of the Automated Biometric Security or Surveillance System;

   b. To the extent that deployment of the Automated Biometric Security or Surveillance System entails the creation of a Gallery, periodically, and at least monthly, reviewing such Gallery to identify and, as soon as practicable, remove samples of Biometric Information that (1) have been associated with two or more Inaccurate Outputs, including Outputs that were determined to be Inaccurate based on investigations conducted in response to consumer complaints pursuant to sub-Provision IV.C of this Order; (2) do not meet the quality standards referenced in sub-Provision III.D.6.a; (3) are required to be deleted pursuant to Provision V of this Order, entitled "Required Retention Limits for Biometric Information;" or (4) have been enrolled without a reasonable basis or in violation of policies and procedures implemented pursuant to sub-Provision III.D.5;

11

       c.   Periodically, and at least annually, reviewing the means by which Biometric Information to be used in connection with the Automated Biometric Security or Surveillance System is captured, including the extent to which any software or hardware used to collect Biometric Information is functioning properly and are consistently capturing samples of Biometric Information that meet the quality standards developed and implemented pursuant to sub-Provision III.D.6.a and are not otherwise contributing to the generation of Inaccurate Outputs; and

   7.  Conducting documented testing of the Automated Biometric Security or Surveillance System prior to deployment and at least once every twelve (12) months thereafter.  Such testing must be conducted with the Affirmative Express Consent of individuals whose Biometric Information will be used for testing and must:

       a.   Be conducted under conditions that materially replicate the conditions under which the Automated Biometric Security or Surveillance System is actually used, taking into account factors that affect the accuracy of the type of Automated Biometric Security or Surveillance System to be tested, the means by which Biometric Information to be used in connection with the Automated Biometric Security or Surveillance System is captured, and the roles of Operators;

       b.   Determine the rate at which the Automated Biometric Security or Surveillance System's Outputs are Inaccurate, including by assessing the extent to which the Outputs can be verified using evidence or information other than an Output of an Automated Biometric Security or Surveillance System.  For example, if an Output indicates the identity of an individual, the Output is verified if it is corroborated by a review of government-issued identification documents;

       c.   Identify factors that cause or contribute to Inaccurate Outputs; and

       d.   Assess and measure any statistically significant variation in the Automated Biometric Security or Surveillance System's rate of Inaccurate Outputs depending on demographic characteristics of the consumers whose Biometric Information is analyzed or used, such as race, ethnicity, sex, gender, age, or disability (alone or in combination).

E.  Evaluate and adjust the Program in light of any circumstance that Respondents know or have reason to know may materially affect the Program's effectiveness.  At a minimum, every twelve (12) months, each Covered Business must evaluate the effectiveness of the Program in light of the System Assessment and the results of all monitoring, testing, and documentation conducted pursuant to the Program.  Respondents must implement modifications to substantially and timely remediate any identified risks that consumers may experience physical, financial, or reputational injury, stigma, or severe emotional

distress, including in connection with communications of the Outputs to law enforcement or other third parties, taking into account the extent to which such harms are likely to disproportionately affect particular demographics of consumers based on race, ethnicity, gender, sex, age, or disability (alone or in combination);

F.   Provide the written System Assessment and Program, and any evaluations thereof or updates thereto, to Respondents' board of directors or governing body or, if no such board or equivalent governing body exists, to a senior officer of Respondents responsible for the Program at least once every twelve (12) months; and

G.   Not deploy or discontinue deployment of an Automated Biometric Security or Surveillance System if:

1.   Respondents do not possess competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that Outputs of the Automated Biometric Security or Surveillance System are likely to be accurate.  For purposes of this Provision III, competent and reliable scientific evidence means tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons and are generally accepted in the profession to yield accurate and reliable results; or

2.   Respondents have reason to believe, taking into account the System Assessment, the Program, all consumer complaints, and all monitoring, testing, documentation, and evaluations conducted pursuant to the Program, that:

a.   Respondents' use of the Automated Biometric Security or Surveillance System creates or contributes to a risk that Inaccurate Outputs will cause consumers to experience substantial physical, financial, or reputational injury, discrimination based on race, ethnicity, gender, sex, age, or disability, stigma, or severe emotional distress to consumers, including in connection with communications of the Outputs to law enforcement or other third parties, taking into account the extent to which such harms are likely to disproportionately affect consumers based on race, ethnicity, gender, sex, age, or disability; and

b.   The identified risks are not substantially and timely eliminated by modifications to the Program.

## IV.    Mandatory Notice and Complaint Procedures for Automated Biometric Security or Surveillance Systems

**IT IS FURTHER ORDERED** that Respondents, for any Covered Business, in connection with the operation of any retail store or retail pharmacy or online retail platform,

must not use any Automated Biometric Security or Surveillance System in connection with Biometric Information collected from or about consumers of such retail store, retail pharmacy, or online retail platform, unless (1) use of the Automated Biometric Security or Surveillance System is not prohibited pursuant to Provision I of this Order entitled Use of Facial Recognition or Analysis Systems Prohibited and (2) Respondents, prior to implementing any such Automated Biometric Security or Surveillance System, establish and implement, and thereafter maintain, procedures to provide consumers with notice and a means of submitting complaints related to Outputs of the Automated Biometric Security or Surveillance System.  Specifically, Respondents must:

A.  Provide written notice to all consumers who will have their Biometric Information enrolled in any Gallery used in conjunction with an Automated Biometric Security or Surveillance System, unless Respondents are unable to provide the notice due to safety concerns or the nature of a security incident that forms the basis for enrollment. Respondents shall provide such notice prior to or promptly after enrollment, and the notice shall include:

   1.  An explanation for the reasonable basis (as described in sub-Provision III.D.5) for enrollment in the Gallery, including a description of any security incident that provided that basis;

   2.  Instructions about how to obtain a copy of the sample of Biometric Information that was collected in order to enroll the consumer, which Respondents must make available upon request so long as Respondents retain said sample;

   3.  The length of time for which Respondent will retain the consumer's Biometric Information in the Gallery; and

   4.  An email address, online form, mailing address, and telephone number to which consumers can direct complaints or inquiries about their enrollment in the Gallery; the Automated Biometric Security or Surveillance System; or retention of their Biometric Information.

B.  Provide written notice to all consumers with respect to whom Respondents, in connection with an Output, take an action that could result in physical, financial, or reputational harm to the consumers, including in connection with communications of the Output to law enforcement or other third parties, unless Respondents are unable to provide the notice due to safety concerns or the nature of a security incident relating to the Output. Respondents shall provide such notice prior to taking, or, if prior notice is infeasible, at the time of taking an action, and the notice shall include:

   1.  The date, approximate time, and location of the Output;

   2.  A description of the action or actions taken;

    3.   An explanation of how that action relates to the Output; and

    4.   An email address, online form, mailing address, and telephone number to which consumers can direct complaints or inquiries about the Output; the Automated Biometric Security or Surveillance System that generated the Output; or the use, sharing, or retention of their Biometric Information.

C.   Investigate each complaint to (1) determine whether the relevant Output was an Inaccurate Output, and, if so, identify any factors that likely contributed to the generation of an Inaccurate Output; and (2) assess whether Operators responded to the Output in a manner that was appropriate and consistent with the requirements of this Order; and

D.   Respond to each consumer complaint relating to the Automated Biometric Security or Surveillance System by:

    1.   Within seven (7) days of receiving the complaint, providing written confirmation of receipt to the consumer who submitted the complaint. Such written confirmation should be provided using the same means of communication that the consumer used to submit the complaint, or by another means selected by the consumer during the complaint submission process, and should state that Respondents will investigate the consumer's complaint and provide its conclusions within thirty (30) days;

    2.   Within thirty (30) days of providing the written confirmation, providing a written response to the consumer who submitted the complaint. Such written response must be provided using the same means of communication as the written confirmation and must (1) state whether the Output was determined to be an Inaccurate Output and the basis for such a determination; and (2) describe in general terms actions taken in response to the complaint.

## V.    Required Retention Limits for Biometric Information

**IT IS FURTHER ORDERED** that Respondent, for any Covered Business, in connection with the operation of any retail store, retail pharmacy, or online retail platform must, prior to implementing any Automated Biometric Security or Surveillance System, develop and implement, for each type of Biometric Information from or about consumers of such physical retail location or online retail platform that is collected in whole or in part for use in connection with any Automated Biometric Security or Surveillance System, a written retention schedule setting forth:

A.   All purposes and business needs for which the Covered Business collects or uses the type of Biometric Information;

B.   A timeframe for deletion of the Biometric Information that is no greater than five (5) years, except to the extent that retention beyond five years is required by law or Respondents have obtained Affirmative Express Consent for the retention within the

previous five (5) years, and precludes retention beyond what is reasonably necessary to achieve the purpose or purposes and serve the business needs for which it was collected; and

C.  The basis for the timeframe for deletion of the Biometric Information, including any foreseeable effect on the likelihood of Inaccurate Outputs of the passage of time since a given sample of the type of Biometric Information was collected or enrolled in a Gallery.

## VI.   Disclosure of Automated Biometric Security or Surveillance Systems

**IT IS FURTHER ORDERED** that Respondents, for any Covered Business, in connection with the operation of any retail store, retail pharmacy, or online retail platform, must, within thirty (30) days after the effective date of this Order, post Clear and Conspicuous notices disclosing the Covered Business's use of any Automated Biometric Security or Surveillance System in connection with Biometric Information collected from or about consumers of the physical retail location or online retail platform.  Such notices must be posted in each physical retail location, and on each website, mobile application, or online service on or through which Biometric Information from or about consumers is collected or used in whole or in part for the purpose of operating an Automated Biometric Security or Surveillance System, and must include, as to each such location, website, mobile application, or online service:

A.  The specific types of Biometric Information that are collected in whole or in part for the purpose of operating an Automated Biometric Security or Surveillance System;

B.  The types of Outputs that are generated by the Automated Biometric Security or Surveillance Systems;

C.  All purposes for which the Covered Business uses each Automated Biometric Security or Surveillance System or its Outputs, including actions that the Covered Business may take on the basis of Outputs; and

D.  The timeframe for deletion of each type of Biometric Information used, as established pursuant to Provision V of this Order, entitled "Required Retention Limits for Biometric Information."

## VII.   Prohibition Against Misrepresentations

**IT IS FURTHER ORDERED** that Respondents and Respondents' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with any product or service, must not misrepresent in any manner, expressly or by implication, the extent to which Respondents maintain and protect the privacy, security, confidentiality, or integrity of Covered Information, including, but not limited to, misrepresentations related to:

A.  Respondents' privacy and security measures to prevent unauthorized access to Covered Information;

B. Respondents' privacy and security measures to honor the privacy choices exercised by consumers;

C. Respondents' collection, maintenance, use, disclosure, or deletion of Covered Information; or

D. The extent to which Respondents make or have made Covered Information accessible to any third parties.

### VIII.   Mandated Information Security Program for Covered Businesses

**IT IS FURTHER ORDERED** that Respondents, for any Covered Business, in connection with the collection, maintenance, use, or disclosure of, or provision of access to, Covered Information, must each, within 90 days of the effective date of this Order, establish and implement, and thereafter maintain, a comprehensive information security program ("Information Security Program") that protects the security, confidentiality, and integrity of such Covered Information.  To satisfy this requirement, each Covered Business must, at a minimum:

A. Document in writing the content, implementation, and maintenance of the Information Security Program;

B. Provide the written Information Security Program and any evaluations thereof or updates thereto to the Covered Business' board of directors or governing body or, if no such board or equivalent governing body exists, to a senior officer of the Covered Business responsible for the Covered Business's Information Security Program at least once every twelve (12) months and promptly (not to exceed 30 days) after a Covered Incident affecting 500 or more consumers;

C. Designate a qualified employee or employees, who report(s) directly to the Executive Leadership Team (including the Chief Executive Officer, Chief Information Officer, and Chief Legal Officer) to coordinate and be responsible for the Information Security Program and keep the Executive Leadership Team and Board of Directors informed of the Information Security Program, including all actions and procedures implemented to comply with the requirements of this Order, and any actions and procedures to be implemented to ensure continued compliance with this Order;

D. Assess and document, at least once every twelve (12) months and promptly (not to exceed 30 days) following a Covered Incident affecting 100 or more consumers, internal and external risks to the security, confidentiality, or integrity of Covered Information that could result in the (1) unauthorized collection, maintenance, alteration, destruction, use, disclosure of, or provision of access to, Covered Information; or the (2) misuse, loss, theft, or other compromise of such information;

E. Design, implement, maintain, and document safeguards that control for the internal and external risks Covered Businesses identify to the security, confidentiality, or integrity of

17

Covered Information identified in response to sub-Provision D of this Provision.  Each safeguard must be based on the volume and sensitivity of the Covered Information that is at risk, and the likelihood that the risk could be realized and result in the (1) unauthorized collection, maintenance, alteration, destruction, use, disclosure of, or provision of access to, Covered Information; or the (2) misuse, loss, theft, or other compromise of such information.  Such safeguards must also include:

1. Training of all employees, at least once every twelve (12) months, on how to safeguard Covered Information including, for information security personnel, security updates and training sufficient to address relevant security risks, and verifying that key information security personnel take steps to maintain current knowledge of changing information security threats and countermeasures;

2. Documenting in writing the content, implementation, and maintenance of an incident response plan designed to ensure the identification of, investigation of, and response to the unauthorized access to Covered Information. Respondents shall revise and update this incident response plan to adapt to material changes to their assets or networks;

3. Implementing technical measures to log and monitor all networks and assets for anomalous activity and active threats. Such measures shall require Respondents to determine baseline system activity and identify and respond to anomalous events and unauthorized attempts to access or exfiltrate Covered Information;

4. Policies and procedures to minimize data collection, storage, and retention, including data deletion or retention policies and procedures;

5. Implementing data access controls for all assets (including databases) storing Covered Information and technical measures, policies, and procedures to minimize or prevent online attacks resulting from the misuse of valid credentials, including:  (a) restricting inbound and outbound connections; (b) requiring and enforcing strong passwords or other credentials; (c) preventing the reuse of known compromised credentials to access Covered Information; (d) implementing automatic password resets for known compromised credentials; and (e) limiting employee access to what is needed to perform that employee's job function;

6. Requiring multi-factor authentication methods for all employees, contractors, and affiliates in order to access any assets (including databases) storing Covered Information. Such multi-factor authentication methods for all employees, contractors, and affiliates should not include telephone or SMS-based authentication methods and must be resistant to phishing attacks. Respondents may use equivalent, widely adopted industry authentication options that are not multi-factor, if the person responsible for the Information

18

Security Program under sub-Provision C of this Provision:  (1) approves in writing the use of such equivalent authentication options; and (2) documents a written explanation of how the authentication options are widely adopted and at least equivalent to the security provided by multi-factor authentication;

7. Developing and implementing configuration standards to harden system components against known threats and vulnerabilities. New system components shall not be granted access to any Covered Businesses' network, resources, or Covered Information until they meet Respondents' configuration standards;

8. Encryption of, at a minimum, all Social Security numbers, passport numbers, financial account information, tax information, dates of birth associated with a user's account, Health Information, and user account credentials while in transit or at rest on each Covered Businesses' computer networks, including but not limited to cloud storage;

9. Policies and procedures to ensure that all networks, systems, and assets with access to Covered Information within the Covered Businesses' custody or control are securely installed and inventoried at least once every twelve (12) months;

10. Implementing vulnerability and patch management measures, policies, and procedures that (a) require confirmation that any directives to apply patches or remediate vulnerabilities are received and completed and (b) include timelines for addressing vulnerabilities that account for the severity and exploitability of the risk implicated; and

11. Enforcing policies and procedures to ensure the timely investigation of data security events and the timely remediation of critical and high-risk security vulnerabilities.

F. Assess, at least once every twelve (12) months and promptly (not to exceed 30 days) following a Covered Incident affecting 100 or more consumers, the sufficiency of any safeguards in place to address the risks to the security, confidentiality, or integrity of Covered Information, and modify the Information Security Program based on the results;

G. Test and monitor the effectiveness of the safeguards in place at least once every twelve (12) months and promptly (not to exceed 30 days) following a Covered Incident affecting 100 or more consumers, and modify the Information Security Program based on the results as necessary. Such testing and monitoring must include:  (1) vulnerability testing of each Covered Business' network and applications once every four (4) months and promptly (not to exceed 30 days) after a Covered Incident; and (2) penetration testing of each Covered Business' network(s) and applications at least once every twelve (12) months and promptly (not to exceed 30 days) after a Covered Incident;

19

H.  Evaluate and adjust the Information Security Program in light of any material changes to a Covered Business' operations or business arrangements, a Covered Incident affecting 100 or more consumers, new or more efficient technological or operational methods to control for the risks identified in sub-Provision D of this Provision, or any other circumstances that a Covered Business or its officers, agents, or employees know or have reason to know may have a material impact on the effectiveness of the Information Security Program or any of its individual safeguards.  At a minimum, each Covered Business must evaluate the Information Security Program at least once every twelve (12) months and modify the Information Security Program, if appropriate, based on the results;

I.  Select and retain Vendors capable of safeguarding Covered Information they access through or receive from each Covered Business, including by implementing and maintaining a uniform process that is fully documented in writing to conduct risk assessments for each Vendor, and contractually require Vendors to implement and maintain safeguards sufficient to address the internal and external risks to the security, confidentiality, or integrity of Covered Information.  The uniform process must include a review and analysis of the information and documentation obtained about each Vendor pursuant to this Provision.  The level of the assessment for each Vendor should be commensurate with the risk it poses to the security of Covered Information;

J.  Require each Vendor agree by contract (upon renewal or new engagement or, in any event, within 180 days of the effective date of this Order) to:

   1.  Develop and implement policies and procedures for the prompt remediation and investigation of any incident that results in the Vendor or Covered Business notifying, pursuant to an applicable statutory or regulatory requirement, any U.S. federal, state, or local government entity that information of or about an individual consumer was, or is reasonably believed to have been, accessed, acquired, or publicly exposed without authorization; and

   2.  Notify the Covered Business in writing as soon as possible, and in any event no later than seventy-two (72) hours, if the Vendor has reason to believe that any person has accessed, exfiltrated, or otherwise obtained without authorization Covered Information that the Vendor obtained from the Covered Business.

K.  Obtain or possess for each Vendor, within 180 days of the effective date of this Order, documentation regarding the Vendor's information security program that is material to the security of Covered Information within the possession, custody, or control of the Covered Business, including, without limitation, documentation of the Vendor's cybersecurity risk assessment conducted within the last twelve (12) months.  The Covered Business must be in possession of such documentation before it provides the Vendor with access to Covered Information;

L.  Determine in writing, at least once every twenty-four (24) months, whether there has been a material change to the Vendor's information security program.  If there has been a

material change, the Covered Business must obtain or possess new documentation regarding the Vendor's information security program that is material to the security of Covered Information within the possession, custody, or control of the Covered Business;

M.  Maintain in one or more central repositories all documentation about or provided by each Vendor pursuant to sub-Provisions J, K, and L of this Provision, including but not limited to each contract with a Vendor, for a period of five (5) years from when it was obtained or provided. This sub-Provision is in addition to and not in lieu of the Provision entitled Recordkeeping;

N.  At least once every twenty-four (24) months, and promptly following a Covered Incident affecting 100 or more consumers involving a Vendor or determination of a material change to a Vendor's information security program under sub-Provision L of this Provision, conduct written reassessments of each Vendor (or, in the case of a Covered Incident affecting 100 or more consumers, each relevant Vendor) to determine the continued adequacy of their safeguards to control the internal and external risks to the security of Covered Information and document the basis for the Covered Business's determination as to whether each Vendor's safeguards are adequate.  The level of the assessment for each Vendor should be commensurate with the risk it poses to the security of Covered Information; and

O.  Maintain in one or more central repositories all documentation created by the Covered Business pursuant to sub-Provision N of this Provision for a period of five (5) years from when it was created. This sub-Provision is in addition to and not in lieu of the Provision entitled Recordkeeping.

### IX.    Third Party Information Security Assessments for Covered Businesses

**IT IS FURTHER ORDERED** that Respondents must obtain initial and biennial assessments ("Assessments"):

A.  The Assessments must be obtained from a qualified, objective, independent third-party professional ("Assessor"), who:  (1) uses procedures and standards generally accepted in the profession; (2) conducts an independent review of the Information Security Program; and (3) retains all documents relevant to each Assessment for 5 years after completion of such Assessment and will provide such documents to the Commission within 10 days of receipt of a written request from a representative of the Commission.  No documents may be withheld by the Assessor on the basis of a claim of confidentiality, proprietary or trade secrets, work product protection, attorney-client privilege, statutory exemption, or any similar claim.

B.  For each Assessment, Respondents must provide the Associate Director for Enforcement for the Bureau of Consumer Protection at the Federal Trade Commission with the name, affiliation, and qualifications of the proposed Assessor, whom the Associate Director shall have the authority to approve in their sole discretion.

C. The reporting period for the Assessments must cover:  (1) the first 180 days after the Mandated Information Security Program for Covered Businesses required by Provision VIII of this Order has been put in place for the initial Assessment; and (2) each two-year period thereafter for 20 years after issuance of the Order for the biennial Assessments.

D. Each Assessment must, for the entire assessment period:

    1. Determine whether Respondents have implemented and maintained the Information Security Program required by the Provision entitled Mandated Information Security Program for Covered Businesses;

    2. Assess the effectiveness of Respondents' implementation and maintenance of sub-Provisions A-O of the Provision entitled Mandated Information Security Program for Covered Businesses;

    3. Identify any gaps or weaknesses in, or instances of material noncompliance with, the Information Security Program;

    4. Address the status of gaps or weaknesses in, or instances of material noncompliance with, the Information Security Program that were identified in any prior Assessment required by this Order; and

    5. Identify specific evidence (including, but not limited to, documents reviewed, sampling and testing performed, and interviews conducted) examined to make such determinations, assessments, and identifications, and explain why the evidence that the Assessor examined is (a) appropriate for assessing an enterprise of the business's size, complexity, and risk profile; and (b) sufficient to justify the Assessor's findings.  No finding of any Assessment shall rely primarily on assertions or attestations by Respondents' management.  The Assessment must be signed by the Assessor, state that the Assessor conducted an independent review of the Information Security Program and did not rely primarily on assertions or attestations by Respondents' management, and state the number of hours that each member of the assessment team worked on the Assessment.  To the extent any Respondent revises, updates, or adds one or more safeguards required under the Provision entitled Mandated Information Security Program for Covered Businesses in the middle of an Assessment period, the Assessment must assess the effectiveness of the revised, updated, or added safeguard(s) for the time period in which it was in effect, and provide a separate statement detailing the basis for each revised, updated, or additional safeguard.

E. Each Assessment must be completed within 60 days after the end of the reporting period to which the Assessment applies.  Unless otherwise directed by a Commission representative in writing, Respondents must submit an unredacted copy of the initial Assessment and a proposed redacted copy suitable for public disclosure of the initial Assessment to the Commission within 10 days after the Assessment has been completed via email to DEbrief@ftc.gov or by overnight courier (not the U.S. Postal Service) to:

Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin, "*In re Rite Aid Corporation*, FTC File No. C-4308."  Respondents must retain an unredacted copy of each subsequent biennial Assessment as well as a proposed redacted copy of each subsequent biennial Assessment suitable for public disclosure until the Order is terminated and must provide each such Assessment to the Associate Director for Enforcement within ten (10) days of request.  The initial Assessment and any subsequent biennial Assessment provided to the Commission must be marked, in the upper right-hand corner of each page, with the words "Information Security Program Assessment" in red lettering.

### X.    Cooperation with Third-Party Information Security Assessor

**IT IS FURTHER ORDERED** that, Respondents, whether acting directly or indirectly, in connection with any Assessment required by the Provision entitled Third Party Information Security Assessments for Covered Businesses must:

A. Provide or otherwise make available to the Assessor all information and material in their possession, custody, or control that is relevant to the Assessment for which there is no reasonable claim of privilege;

B. Provide or otherwise make available to the Assessor information about Respondents' networks and all of Respondents' information technology assets so that the Assessor can determine the scope of the Assessment, and visibility to those portions of the networks and information technology assets deemed in scope; and

C. Disclose all material facts to the Assessor, and not misrepresent in any manner, expressly or by implication, any fact material to the Assessor's:  (1) determination of whether Respondents have implemented and maintained the Mandated Information Security Program for Covered Businesses; (2) assessment of the effectiveness of the Respondents' implementation and maintenance of sub-Provisions A-O of the required Mandated Information Security Program for Covered Businesses; or (3) identification of any gaps or weaknesses in, or instances of material noncompliance with, the Mandated Information Security Program for Covered Businesses.

### XI.    Annual Certification

**IT IS FURTHER ORDERED** that Respondents must:

A. One year after the issuance date of this Order, and each year thereafter, provide the Commission with a certification from Corporate Respondents' Chief Executive Officer, _____, or if Mr./Ms. _____ no longer serves as Respondents' Chief Executive Officer, President, or such other officer (regardless of title) that is designated in that Respondent's Bylaws or resolution of the Board of Directors as having the duties of the principal executive officer of Respondent, then a senior corporate manager, or, if no such senior corporate manager exists, a senior officer responsible for Respondents'

Information Security Program that: (1) each Covered Business has established, implemented, and maintained the requirements of this Order; (2) each Covered Business is not aware of any material noncompliance that has not been (a) corrected or (b) disclosed to the Commission; and (3) includes a brief description of all Covered Incidents affecting 100 or more consumers that Respondents verified or confirmed during the certified period.  The certification must be based on the personal knowledge of Mr./Ms._____, the senior corporate manager, senior officer, or subject matter experts upon whom Mr./Ms._____, the senior corporate manager, or senior officer reasonably relies in making the certification.

B.  Unless otherwise directed by a Commission representative in writing, submit all annual certifications to the Commission pursuant to this Order via email to DEbrief@ftc.gov or by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin, "*In re Rite Aid Corporation*, FTC File No. C-4308."

## XII.    Covered Incident Reports

**IT IS FURTHER ORDERED** that, within 10 days of any notification to a United States federal, state, or local entity of a Covered Incident affecting 500 or more consumers, Respondents, for any Covered Business, must submit a report to the Commission. The report must include, to the extent possible:

A.  The date, estimated date, or estimated date range when the Covered Incident occurred;

B.  A description of the facts relating to the Covered Incident, including the causes and scope of the Covered Incident, if known;

C.  A description of each type of information that was affected by the Covered Incident;

D.  The number of consumers whose information was affected by the Covered Incident;

E.  The acts that each Covered Business has taken to date to remediate the Covered Incident and protect Covered Information from further exposure or access, and protect affected individuals from identity theft or other harm that may result from the Covered Incident; and

F.  A representative copy of each materially different notice sent by each Covered Business to consumers or to any U.S. federal, state, or local government entity regarding the Covered Incident.

Unless otherwise directed by a Commission representative in writing, all Covered Incident reports to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of

Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin, "*In re Rite Aid Corporation*, FTC File No. C-4308."

### XIII.   Acknowledgments of the Order

**IT IS FURTHER ORDERED** that Respondents obtain acknowledgments of receipt of this Order:

A. Each Respondent, within ten (10) days after the effective date of this Order, must submit to the Commission an acknowledgment of receipt of this Order.

B. For twenty (20) years after the issuance date of this Order, each Respondent must deliver a copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2) all of Respondents' current and future subsidiaries that own, control, or operate one or more stores or online retail platforms; (3) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (4) any business entity resulting from any change in structure as set forth in the Provision entitled Compliance Reports and Notices.  Delivery must occur within ten (10) days after the effective date of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C. From each individual or entity to which Respondents delivered a copy of this Order, Respondents must obtain, within thirty (30) days, a signed and dated acknowledgment of receipt of this Order.

### XIV. Compliance Reports and Notices

**IT IS FURTHER ORDERED** that Respondents make timely submissions to the Commission:

A. One year after the issuance date of this Order, each Respondent must submit a compliance report, sworn under penalty of perjury, in which each Respondent must:  (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission, may use to communicate with Respondent; (b) identify all of that Respondent's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business; (d) describe in detail whether and how that Respondent is in compliance with each Provision of this Order, including a discussion of all of the changes the Respondent made to comply with the Order; and (e) provide a copy of each Acknowledgment of the Order obtained pursuant to this Order, unless previously submitted to the Commission;

B. Each Respondent must submit a compliance notice, sworn under penalty of perjury, within fourteen (14) days of any change in (a) any designated point of contact; or (b) the

structure of such Respondent or any entity that such Respondent has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order;

C. Each Respondent must submit notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Respondent within fourteen (14) days of its filing;

D. Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature;

E. Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to:  Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC  20580.  The subject line must begin: "In re Rite Aid Corporation, FTC File No. C-4308".

## XV. Recordkeeping

**IT IS FURTHER ORDERED** that Respondents must create certain records for twenty (20) years after the issuance date of the Order, and retain each such record for five (5) years, unless otherwise specified below. Specifically, Respondents must create and retain the following records:

A. Accounting records showing the revenues from all goods or services sold, the costs incurred in generating those revenues, and resulting net profit or loss;

B. Personnel records showing, for each person providing services in relation to any aspect of the Order, whether as an employee or otherwise, that person's:  name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C. Copies or records of all consumer complaints concerning the subject matter of this Order, whether received directly or indirectly, such as through a third party, and any response;

D. All records necessary to demonstrate full compliance with each Provision of this Order, including all submissions to the Commission;

E. For five (5) years after the date of preparation of each System Assessment required by this Order, all materials relied upon to prepare the System Assessment, including all

plans, test results, reports, studies, reviews, audits, policies, training materials, and assessments, and any other materials concerning Respondents' compliance with related Provisions of this Order, for the compliance period covered by such System Assessment;

F. A copy of each widely disseminated and materially different representation by Defendants that describes the extent to which Defendants maintains or protects the privacy, security, availability, confidentiality, or integrity of any Covered Information, including any representation concerning a change in any website or other service controlled by Respondents that relates to privacy, security, availability, confidentiality, or integrity of Covered Information;

G. For five (5) years after the date of preparation of each Assessment by the Assessor, as those terms are defined in Provision IX, all materials and evidence that the Assessor considered, reviewed, relied upon or examined to prepare the Assessment, whether prepared by or on behalf of Respondents, including all plans, reports, studies, reviews, audits, audit trails, policies, training materials, and assessments, and any other materials concerning compliance with related Provisions of this Order, for the compliance period covered by such Assessment;

H. For five (5) years from the date received, copies of all subpoenas and other communications with law enforcement, if such communications relate to Respondents' compliance with this Order; and

I. For five (5) years from the date created or received, all records, whether prepared by or on behalf of a Respondent, that tend to show any lack of compliance by a Respondent with this Order.

## XVI. Compliance Monitoring

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Respondents' compliance with this Order:

A. Within fourteen (14) days of receipt of a written request from a representative of the Commission, each Respondent must:  submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce records for inspection and copying.  The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B. For matters concerning this Order, representatives of the Commission are authorized to communicate directly with each Respondent.  Respondents must permit representatives of the Commission to interview anyone affiliated with any Respondent who has agreed to such an interview.  The interviewee may have counsel present.

C. The Commission may use all other lawful means, including posing through its

representatives as consumers, suppliers, or other individuals or entities, to Respondents or any individual or entity affiliated with Respondents, without the necessity of identification or prior notice.  Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XVII. Modification of Original Decision and Order

**IT IS FURTHER ORDERED** that this Decision and Order supersedes the Decision and Order the Commission previously issued in *In re Rite Aid Corporation*, C-4308, 150 F.T.C. 694 (Nov. 12, 2010).

## XVIII. Order Effective Dates

**IT IS FURTHER ORDERED** that this Order is final and effective upon the date of its publication on the Commission's website (ftc.gov) as a final order.  This Order will terminate twenty (20) years from the date of its issuance (which date may be stated at the end of this Order, near the Commission's seal), or twenty (20) years from the most recent date that the United States or the Commission files a complaint (with or without an accompanying settlement) in federal court alleging any violation of this Order, whichever comes later; *provided, however,* that the filing of such a complaint will not affect the duration of:

A.  Any Provision in this Order that terminates in less than twenty (20) years;

B.  This Order's application to any Respondent that is not named as a defendant in such complaint; and

C.  This Order if such complaint is filed after the Order has terminated pursuant to this Provision.

*Provided, further,* that if such complaint is dismissed or a federal court rules that the Respondent did not violate any Provision of the Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Order will terminate according to this Provision as though the complaint had never been filed, except that the Order will not terminate between the date such complaint is filed and the later of the deadline for appealing such dismissal or ruling and the date such dismissal or ruling is upheld on appeal.

By the Commission.

April Tabor
Secretary

SEAL:
ISSUED:

# E

Bankruptcy Court Order Authori ing and Approving the Settlement Between Rite Aid and the Federal Trade Commission

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | |
|---|---|
| In re: <br> RITE AID CORPORATION, *et al.*, <br> Debtors.[1] | Chapter 11 <br><br> Case No. 23-18993 (MBK) <br><br> (Jointly Administered) |

Order Filed on January 23, 2024
by Clerk
U.S. Bankruptcy Court
District of New Jersey

## ORDER AUTHORIZING AND APPROVING THE SETTLEMENT BETWEEN THE DEBTORS AND THE FEDERAL TRADE COMMISSION

The relief set forth on the following pages is **ORDERED**.

DATED: January 23, 2024

Honorable Michael B. Kaplan
United States Bankruptcy Judge

Upon the *Debtors' Motion for Entry of an Order Authorizing and Approving the Settlement Between the Debtors and the Federal Trade Commission* ("Motion"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the District of New Jersey, entered July 23, 1984, and amended on September 18, 2012 (Simandle, C.J.); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion was appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested at a hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor **IT IS HEREBY ORDERED THAT**:

1.      The Motion is **GRANTED** on the basis as set forth herein.

2.      The Proposed FTC Order attached hereto as Exhibit A is hereby approved.  The Debtors are authorized and directed to take all actions necessary to immediately continue and fully implement resolving the Complaint in accordance with the terms, conditions, and agreements set forth in the Proposed FTC Order.

3.      This Order shall be binding on the Debtors and their subsidiaries, divisions, successors and assigns; the Debtors' estates; all creditors and parties-in-interest; and any trustee appointed in these cases.

4.      Nothing in this Order or in the District Court Order shall be construed to waive, release, forfeit or otherwise impair any claim or cause of action any Debtor or any affiliate of any

Debtor may possess against any person or entity arising from the conduct alleged in the District Court Action, including but not limited to claims in the nature of indemnity or contribution.

5. Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

6. Notice of the Motion as provided therein shall be deemed good and sufficient notice and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

7. The requirement set forth in Local Rule 9013-1(a)(3) that any motion be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or otherwise waived.

8. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# EXHIBIT A

**Proposed FTC Order**

# Exhibit A

[Proposed] Stipulated Order for Permanent
Injunction and Other Relief

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| RITE AID CORPORATION, a corporation, and, | ) |
| | ) |
| RITE AID HDQTRS. CORP., a corporation, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**Case No. 2:23-cv-5023**

**STIPULATED ORDER FOR PERMANENT INJUNCTION AND OTHER RELIEF**

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), filed its Complaint for Permanent Injunction and Other Relief ("Complaint") pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), against Defendants Rite Aid Corporation and Rite Aid Hdqtrs. Corp. Defendants have waived service of the summons and the Complaint.

Defendants Rite Aid Corporation and Rite Aid Hdqtrs. Corp. filed petitions for relief under Chapter 11 of the Bankruptcy Code on October 15, 2023. *See In re Rite Aid Corporation*, Case No. 3:23-bk-18993 (Bankr. D.N.J.); *In re Rite Aid Hdqtrs. Corp.*, Case No. 3:23-bk-18999 (Bankr. D.N.J.) (collectively, the "Bankruptcy Cases"). These cases are being jointly administered in the lead case, *In re Rite Aid Corporation*, Case No. 3:23-bk-18993 (Bankr. D.N.J.) (the "Bankruptcy Court").

Plaintiff and Defendants stipulate to the entry of this Order for Permanent Injunction and Other Relief ("Stipulated Order") to resolve all matters in dispute in this action between them. Defendants shall seek approval from the Bankruptcy Court to enter this Stipulated Order.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1.    This Court has jurisdiction over this matter.

2.    Venue is proper as to all parties in this District.

3.    The Complaint charges Defendants with unfair acts or practices in violation of Sections 5(a) and 5(n) of the FTC Act, 15 U.S.C. §§ 45(a), (n), in connection with their (1) facial recognition technology practices and (2) failure to implement or maintain a comprehensive information security program in violation of Part II of the Commission's Decision and Order in *In re Rite Aid Corporation*, C-4308, 150 F.T.C. 694 (Nov. 12, 2010) ("2010 Decision and Order").  Defendants are thus subject to relief under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

4.    Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Stipulated Order and the Decision and Order set forth in Attachment A, and agree to bear their own costs and attorney fees.

5.    Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Stipulated Order or in the Decision and Order set forth in Attachment A.  Only for purposes of this action, Defendants admit the facts necessary to establish jurisdiction.

6.    Defendants and Plaintiff waive all rights to appeal or otherwise challenge or contest the validity of this Stipulated Order or the Decision and Order set forth in Attachment A.

7.    The Plaintiff's commencement and prosecution of this action are actions to enforce the Plaintiff's police or regulatory power.  As a result, if the Bankruptcy Cases are

pending as of the date of entry of this Order, these actions are excepted from the automatic stay

pursuant to 11 U.S.C. § 362(b)(4).

## DEFINITIONS

"**Defendant(s)**" means Rite Aid Corporation, Rite Aid Hdqtrs Corp., and all of their

subsidiaries, divisions, successors and assigns, individually, collectively, or in any combination.

## I.    ORDERS OF BANKRUPTCY COURT

IT IS FURTHER ORDERED that this Order does not restrain or enjoin the deposit,

exchange, distribution, investment, or withdrawal of assets owned or held by Defendants and

being administered in accordance with the United States Bankruptcy Code and orders of the

Court in the Bankruptcy Cases.  For the avoidance of doubt this Stipulated Order does not create

a contingent liability against the Defendants and does not preclude the full distribution of assets

held by the Defendants in the Bankruptcy Cases.

## II.    MODIFICATION OF 2010 DECISION AND ORDER

IT IS FURTHER ORDERED that Defendants:  (i) consent to reopening of the proceeding

in FTC Docket No. C-4308; (ii) waive their rights under the show cause procedures set forth in

Section 3.72(b) of the Commission's Rules of Practice, 16 C.F.R. § 3.72(b); and (iii) consent to

modification of the 2010 Decision and Order in *In re Rite Aid Corporation,* C-4308, 150 F.T.C.

694 (Nov. 12, 2010), with the Commission order in Attachment A, which shall replace and

supersede the 2010 Order.

3

### III.    CONTINUING JURISDICTION

IT IS FURTHER ORDERED that this Court shall retain jurisdiction in this matter for

purposes of construction, modification, and enforcement of this Stipulated Order.


SO ORDERED this ___ day of _____ 202__.

_____
UNITED STATES DISTRICT JUDGE

**SO STIPULATED AND AGREED:**

Dated: December 19, 2023                          **FOR THE FEDERAL TRADE COMMISSION**

JAMES A. KOHM                                        BENJAMIN WISEMAN
Associate Director                                   Associate Director
Division of Enforcement                              Division of Privacy and Identity Protection

LAURA KOSS                                           TIFFANY GEORGE
Assistant Director                                   Assistant Director
Division of Enforcement                              Division of Privacy and Identity Protection

_____                              /s/ Robin L. Wetherill
CHRISTOPHER J. ERICKSON                               ROBIN WETHERILL
Attorney                                             Attorney
Division of Enforcement                              Division of Privacy and Identity Protection

BRIAN M. WELKE                                       LEAH FRAZIER
Attorney                                             Attorney
Division of Enforcement                              Division of Privacy and Identity Protection

                                                     N. DIANA CHANG
Federal Trade Commission                             Attorney
600 Pennsylvania Avenue,                             Division of Privacy and Identity Protection
N.W. Mail Stop CC-6316
Washington, D.C. 20580                               Federal Trade Commission
(202) 326-3671 (Erickson); - 2897 (Welke)            600 Pennsylvania Avenue,
cerickson@ftc.gov; bwelke@ftc.gov                    N.W. Mail Stop CC-6316
                                                     Washington, D.C. 20580
                                                     (202) 326-2220 (Wetherill); - 2187
                                                     (Frazier); (415) 848-5100 (Chang)
                                                     rwetherill@ftc.gov; lfrazier@ftc.gov;
                                                     nchang@ftc.gov

Dated: December 13, 2023

**FOR DEFENDANT RITE AID CORPORATION**

Jeffrey S. Stein
Chief Executive Officer
Rite Aid Corporation

Dated: December 13, 2023

**FOR DEFENDANT RITE AID HDQTRS. CORP.**

Jeffrey S. Stein
Chief Executive Officer
Rite Aid Hdqtrs. Corp.

Dated: December 14, 2023

*Mark S. Melodia*

ANTHONY E. DIRESTA
MARK S. MELODIA
Holland & Knight LLP
800 17th Street N.W.
Suite 1100
Washington, D.C. 20006
(202) 955-3000
Anthony.DiResta@hklaw.com
Mark.Melodia@hklaw.com

RICHARD H. CUNNINGHAM
Kirkland & Ellis LLP
1301 Pennsylvania Ave. N.W.
Washington D.C. 20004
(202) 389-3119
Richard.Cunningham@kirkland.com

ALLISON W. BUCHNER
Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
(310) 552-4302
Allison.Buchner@kirkland.com

*Counsel for Defendants Rite Aid Corporation and
Rite Aid Hdqtrs. Corp.*

6

# Attachment A

0723121

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:     **Lina Khan, Chair**
                           **Rebecca Kelly Slaughter**
                           **Alvaro M. Bedoya**

|  |  |
|---|---|
| In the Matter of<br><br>**RITE AID CORPORATION,**<br>**a corporation, and**<br><br>**RITE AID HDQTRS. CORP.,**<br>**a corporation.** | **DECISION AND ORDER**<br><br>**DOCKET NO. C-4308** |

**DECISION**

The Federal Trade Commission ("Commission") initiated an investigation of certain acts and practices of Respondents named in the caption. The Commission's Bureau of Consumer Protection ("BCP") prepared and furnished to Respondents a draft Complaint. BCP proposed presenting the draft Complaint to the Commission for its consideration. If issued by the Commission, the draft Complaint would charge the Respondents with violations of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a), (n), and 53(b), including by violating the Commission's 2010 Decision and Order in the above-captioned matter.

Respondents neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Decision and Order. For purposes of this action only, Respondents admit the facts necessary to establish jurisdiction.

The Commission considered the matter and determined that it had reason to believe that Respondents have violated the Federal Trade Commission Act and the Decision and Order the Commission previously issued in *In re Rite Aid Corporation*, C-4308, 150 F.T.C. 694 (Nov. 12, 2010), and that a Complaint should issue stating its charges in that respect. After due consideration, the Commission issues the Complaint, makes the following Findings, and issues the following Order:

**Findings**

1. The Respondents are:

      a.  Rite Aid Corporation, a Delaware corporation with its principal office or place of business at 1200 Intrepid Avenue, 2nd Floor, Philadelphia, PA 17011; and

      b.  Rite Aid Hdqtrs. Corp., a Delaware corporation with its principal office or place of business at 1200 Intrepid Avenue, 2nd Floor, Philadelphia, PA 17011.

2.  The Commission has jurisdiction over the subject matter of this proceeding and over the Respondents, and the proceeding is in the public interest.

3.  The Complaint charges violations of Section 5 of the FTC Act, 15 U.S.C. § 45, including by violating Provision II of an order previously issued by the Commission.

4.  Respondents waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear its own costs and attorney fees.

5.  Respondents and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## ORDER

### Definitions

For purposes of this Order, the following definitions apply:

A.  "Affirmative Express Consent" means any freely given, specific, informed, and unambiguous indication of an individual consumer's wishes demonstrating agreement by the individual, such as by a clear affirmative action, following a Clear and Conspicuous disclosure to the individual of: (i) the categories of information that will be collected; (ii) the specific purpose(s) for which the information is being collected; (iii) the names or categories of Third Parties collecting the information, or to whom the information is disclosed, provided that if Respondent discloses the categories of Third Parties, the disclosure shall include a hyperlink or information about how to access a separate page listing the names of the Third Parties; (iv) a simple, easily-located means by which the consumer can withdraw consent; and (v) any limitations on the consumer's ability to withdraw consent. The Clear and Conspicuous disclosure must be separate and apart from any "privacy policy," "terms of service," "terms of use," or other similar document, but it may reference them.

The following do not constitute Affirmative Express Consent:

      1.  Inferring consent from the hovering over, muting, pausing, or closing of a given piece of content by the consumer; or

      2.  Obtaining consent through a user interface that has the effect of subverting or impairing user autonomy, decision-making, or choice.

B. "Automated Biometric Security or Surveillance System" means any machine-based system, including any computer software, application, or algorithm, that analyzes or uses Biometric Information of, from, or about individual consumers to generate an Output that relates to those consumers, notwithstanding any assistance by a human being in such analysis or use, and that is used in whole or in part for a Security or Surveillance Purpose. *Provided, however,* that the term "Automated Biometric or Surveillance Security System" as used in this Order does not include:

  1. A camera or similar sensor that is used to capture images or videos of individuals that are not collected or used in connection with the generation of an Output;

  2. Any system to the extent that it is used to authenticate or identify Respondents' employees, contractors, or agents in connection with the performance of their job duties, so long as Respondents receive Affirmative Express Consent for the collection and use of any Biometric Information in connection with such authentication; and

  3. Any system to the extent it is used exclusively in the direct provision of medical services by or under the supervision of a physician, registered nurse, pharmacist, or other licensed health care professional, so long as Respondents receive Affirmative Express Consent for the collection and use of any Biometric Information in connection with such system.

C. "Biometric Information" means data that depict or describe physical, biological, or behavioral traits, characteristics, or measurements of or relating to an identified or identifiable person's body, including depictions or images, descriptions, recordings, or copies of an individual's facial or other physical features (e.g., iris/retina scans), finger or handprints, voice, genetics, or characteristic movements or gestures (e.g., gait or typing pattern). "Biometric Information" does not include data that relates solely to user accounts or credentials, such as a username, or to user devices, such as device IDs or IP addresses, in isolation from data that depict or describe or are used to infer physical, biological, or behavioral traits, characteristics, or measurements of or relating to a person's body.

D. "Clear(ly) and Conspicuous(ly)" means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

  1. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3

2. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

3. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

4. The disclosure must use diction and syntax understandable to ordinary consumers and must appear in English, Spanish, and each other language in which a Covered Business provides signage or other disclosures in the physical location or on the website where the disclosure appears.

5. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

6. The disclosure must not be contradicted or mitigated by, or inconsistent with, any other statements or representations in or near the disclosure.

7. When the deployment of an Automated Biometric Security or Surveillance System targets a specific group, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

E. "Covered Business" means (1) any Respondent; (2) any business of which one or more Respondents is a majority owner or controls, directly or indirectly.

F. "Covered Incident" means any incident that results in a Covered Business notifying, pursuant to a statutory or regulatory requirement, any U.S. federal, state, or local government entity that information of or about an individual consumer was, or is reasonably believed to have been, accessed, acquired, or publicly exposed without authorization.

G. "Covered Information" means information from or about an individual consumer, including: (a) a first and last name; (b) a home or physical address; (c) an email address or other online contact information, such as an instant messaging user identifier or a screen name; (d) a mobile or other telephone number; (e) a driver's license or other government-issued identification number; (f) date of birth; (g) geolocation information sufficient to identify street name and name of a city or town; (h) bank account information or credit or debit card information (including a partial credit or debit card number with more than five digits); (i) user identifier, or other persistent identifier that can be used to recognize a user over time and across different devices, websites, or online services; (j) user account credentials, such as a login name and password (whether plain text, encrypted, hashed, and/or salted); (k) Biometric Information; or (*l*) Health Information.

4

H. "Facial Recognition or Analysis System" means an Automated Biometric Security or Surveillance System that analyzes or uses depictions or images, descriptions, recordings, copies, measurements, or geometry of or related to an individual's face to generate an Output.

I. "Gallery" means a collection, database, or list of samples of Biometric Information created and retained for purposes of comparison with other samples in connection with the use of an Automated Biometric Security or Surveillance System to generate an Output.

J. "Health Information" means individually identifiable information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual. It includes, but is not limited to, the following information relating to an individual: (a) prescription information, such as medication and dosage; (b) prescribing physician name, address, and telephone number; (c) health insurer name, insurance account number, or insurance policy number; (d) information concerning medical- or health-related purchases; and (e) any information that is derived or extrapolated from information about an individual's activities, or pattern of activities, from which a determination is made that the individual has a health condition or is taking a drug.

K. "Inaccurate Output" means an Output that is false, misleading, or incorrect and includes, to the extent that the Output of an Automated Biometric Security or Surveillance System is binary, (1) false positives or false acceptances and (2) false negatives or false rejections.

L. "Output" means a match, alert, prediction, analysis, assessment, determination, recommendation, identification, calculation, candidate list, or inference that is generated by a machine-based system processing Biometric Information.

M. **"**Operator" means an officer, employee, manager, contractor, service provider, or other agent of a Covered Business whose job duties include the operation or oversight of any aspect of an Automated Biometric Security or Surveillance System.

N. "Respondents" mean Rite Aid Corporation, Rite Aid Hdqtrs Corp., and their subsidiaries, divisions, successors and assigns.

O. "Security or Surveillance Purpose" means a purpose related to surveillance (including but not limited to tracking individuals' location or behavior without Affirmative Express Consent); the detection, deterrence, prediction, or investigation of theft, crime, fraud, or other misconduct; or access to locations, material goods, information, systems, or networks.

5

P.  "Vendor" means any person or entity that receives, maintains, processes, or otherwise is permitted access to Covered Information from, by, or at the direction of a Covered Business through its provision of services directly to a Covered Business.

## Provisions

### I.    Use of Facial Recognition or Analysis Systems Prohibited

**IT IS ORDERED** that Respondents, in connection with the activities of any Covered Business, are prohibited for five (5) years from the effective date of this Order from deploying or using, or assisting in the deployment or use of, any Facial Recognition or Analysis System, whether directly or through an intermediary, in any retail store or retail pharmacy or on any online retail platform.

### II.    Deletion of Covered Biometric Information

**IT IS FURTHER ORDERED** that Respondents; and Respondents' officers, agents, and employees; and all other persons in active concert or participation with any of them, who receive actual notice of this Order, must, unless prohibited by law:

A.  Within forty-five (45) days after the effective date of this Order, delete or destroy all photos and videos of consumers used or collected in connection with the operation of a Facial Recognition or Analysis System prior to the effective date of this Order, and any data, models, or algorithms derived in whole or in part therefrom, and provide a written statement to the Commission, sworn under penalty of perjury, confirming that all such information has been deleted or destroyed;

B.  Within sixty (60) days after the effective date of this Order, Respondents must:

    1.  Identify all third parties, other than government entities, that received photos and videos of consumers used or collected in connection with the operation of a Facial Recognition or Analysis System prior to the effective date of this Order, and any data, models, or algorithms derived in whole or in part therefrom from any Covered Business, provide a copy of the Complaint and Order to all such identified third parties, notify all such identified third parties in writing that the Federal Trade Commission alleges that Respondents used that information in a manner that was unfair in violation of the FTC Act, and instruct all such identified third parties to delete all photos and videos of consumers used or collected in connection with the operation of a Facial Recognition or Analysis System prior to the effective date of this Order, and any data, models, or algorithms derived in whole or in part therefrom, and demand written confirmation of deletion.  Defendant's instruction to each such identified third party shall include a description of the Biometric Information to be deleted.  Defendant must provide all instructions sent to the identified third parties to: DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of

6

Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580.  The subject line must begin: "In the Matter of Rite Aid;" and

2. Provide all receipts of confirmation and any responses from third parties within ten (10) days of receipt to: DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580.  The subject line must begin: "In the Matter of Rite Aid."

### III.    Mandated Automated Biometric Security or Surveillance System Monitoring Program

   **IT IS FURTHER ORDERED** that Respondents, in connection with the operation of any retail store or retail pharmacy or online retail platform by any Covered Business, must not use any Automated Biometric Security or Surveillance System in connection with Biometric Information collected from or about consumers of such retail store, retail pharmacy, or online retail platform, unless (1) use of the Automated Biometric Security or Surveillance System is not prohibited pursuant to Provision I of this Order entitled Use of Facial Recognition or Analysis Systems Prohibited; and (2) Respondents first establish and implement, and thereafter maintain, a comprehensive Automated Biometric Security or Surveillance System Monitoring Program (the "Program").  In establishing, implementing, and maintaining the Program, Respondents must identify and address risks that operation of the Automated Biometric Security or Surveillance System will result, in whole or in part, in physical, financial, or reputational harm to consumers,  stigma, or severe emotional distress, including in connection with communications of the Outputs to law enforcement or other third parties, and must also identify and address risks that any such harms will disproportionately affect consumers based on race, ethnicity, gender, sex, age, or disability, alone or in combination.  To satisfy this requirement, Respondents must:

A. Document in writing the content, implementation, and maintenance of the Program;

B. Designate a qualified employee or employees to coordinate and be responsible for the Program;

C. For each Automated Biometric Security or Surveillance System used, prior to its implementation (or for any Automated Biometric Security or Surveillance System in use as of the effective date of this Order, within ninety (90) days of the effective date of this Order) and, thereafter, at least once every twelve (12) months, conduct a written assessment ("System Assessment") of potential risks to consumers from the use of the Automated Biometric Security or Surveillance System, including, at a minimum, risks that consumers could experience physical, financial, or reputational injury, stigma, or severe emotional distress in connection with Inaccurate Outputs of the Automated Biometric Security or Surveillance System (e.g., if the technology misidentifies a consumer).  The System Assessment must include a review of:

1. The consequences for consumers of Inaccurate Outputs of the Automated
   Biometric Security or Surveillance System, including actions that
   Respondents or others intend to or may foreseeably take in whole or in part as
   a result of such Outputs;

2. Any testing relating to the rate or likelihood of Inaccurate Outputs, the extent
   to which such testing was conducted using reliable methodologies and under
   conditions similar to those in which the Automated Biometric Security or
   Surveillance System will operate, and the results of such testing;

3. Any factors that are likely to affect the accuracy of the type of Automated
   Biometric Security or Surveillance System deployed, such as any
   characteristics of Biometric Information, of the context or method in which
   Biometric Information is captured, or of individuals whose Biometric
   Information is used in connection with the Automated Biometric Security or
   Surveillance System (e.g., skin tone or language or dialect spoken), that would
   increase or decrease the likelihood that its use in connection with the
   Automated Biometric Security or Surveillance System would result in
   Inaccurate Outputs;

4. The extent to which the specific components of the Automated Biometric
   Security or Surveillance System as deployed, including the specific types and
   models of any devices or software, that any Covered Business uses or will use
   to capture, transmit, or store Biometric Information could affect the likelihood
   that the Automated Biometric Security or Surveillance System produces
   Inaccurate Outputs;

5. Documentation and monitoring of the Automated Biometric Security or
   Surveillance System's accuracy that Respondents have conducted pursuant to
   sub-Provision III.D;

6. The extent to which the Automated Biometric Security or Surveillance System
   was developed to be used for a similar purpose and under similar conditions to
   those under which any Covered Business deploys or will deploy the
   Automated Biometric Security or Surveillance System;

7. The methods by which any algorithms comprising part of the Automated
   Biometric Security or Surveillance System were developed, including the
   extent to which such components were developed using machine learning or
   any other method that entails the use of datasets to train algorithms, and the
   extent to which these methods increase the likelihood that Inaccurate Outputs
   will occur or will disproportionately affect consumers depending on their race,
   ethnicity, gender, sex, age, or disability status. This review should include, at
   a minimum:

8

a. The sources and manner of collection of data that have been used to train or otherwise develop algorithmic components of the Automated Biometric Security or Surveillance System;

b. The extent to which the training data are materially similar to the Biometric Information that will be used in connection with deployment of the Automated Biometric Security or Surveillance System in light of factors that are known to affect the accuracy of the type of Automated Biometric Security or Surveillance System deployed; and

c. The makeup of any datasets that have been used to train or otherwise develop algorithmic components of the Automated Biometric Security or Surveillance System, including the extent to which the datasets have been representative, in terms of race, ethnicity, gender, sex, age, and disability status, of the population(s) of consumers whose Biometric Information will be used in connection with deployment of the Automated Biometric Security or Surveillance System;

8. The context in which the Automated Biometric Security or Surveillance System is or will be deployed, including the geographical locations of stores deploying the technology, demographic characteristics, including race and ethnicity, of areas surrounding stores where technology is deployed, physical location within stores or sections of stores, such as pharmacies, of system components, and the scale, timing and duration of the deployment (e.g., how long the system will be deployed and whether the system will operate continuously or only under certain circumstances);

9. All policies and procedures governing the operation of the Automated Biometric Security or Surveillance System and its software, algorithms, hardware, or other components;

10. The extent to which Operators receive sufficient and relevant training or are subject to oversight;

11. The extent to which the Automated Biometric Security or Surveillance System is likely to generate Inaccurate Outputs at a higher rate when analyzing or using Biometric Information collected from or about consumers of particular races, ethnicities, sexes, genders, ages, or who have disabilities (or any of these categories in combination), taking into account technical elements of the Automated Biometric Security or Surveillance System and any components thereof, the selection of locations in which to deploy the Automated Biometric Security or Surveillance System, and the context or manner in which any Covered Business has deployed or will deploy the Automated Biometric Security or Surveillance System; and

9

12. The extent to which consumers are able to avoid the Automated Biometric Security or Surveillance System without losing access to any Covered Business's physical retail locations or online services, including by withholding Affirmative Express Consent for, or opting out of, the collection or use of their Biometric Information.

D. Implement, maintain, and document safeguards that are designed to control for the risks Respondents identify in the System Assessment. Each safeguard must be based on the severity of the risk to consumers and the likelihood that the risk could be realized. Such safeguards must also include:

1. Selecting and retaining service providers with duties related to the subject matter of this Order that are capable of performing those duties in a manner consistent with the Program and this Order, and contractually requiring such service providers to (1) comply with the requirements of the Program and this Order and (2) make available to Respondents all information and materials necessary to conduct the System Assessment;

2. Requiring and documenting regular and at least annual training for all Operators, which must cover, at a minimum:

   a. Methodologies for interpreting or assessing the validity of the Outputs of the Automated Biometric Security or Surveillance System, including for judging whether Outputs are Inaccurate;

   b. Evaluation of Biometric Information to determine its quality, value, and appropriateness for use in connection with the Automated Biometric Security or Surveillance System, particularly in light of each relevant factor identified pursuant to sub-Provision III.C.3 and the quality standards implemented pursuant to sub-Provision III.D.6.a;

   c. An overview of the types of human cognitive bias, such as automation bias and confirmation bias, that could foreseeably affect Operators' interpretations of the Outputs;

   d. Known limitations of the Automated Biometric Security or Surveillance System, including factors that are known to affect the accuracy of the Outputs of Automated Biometric Security or Surveillance Systems of the type deployed, such as image or sound quality, the method by which Biometric Information to be used in connection with the Automated Biometric Security or Surveillance System is collected, background images or sounds, the passage of time since the capture of a Biometric Information sample, or relevant demographic, physical, or other traits of the individual to whom Biometric Information pertains (such as race, ethnicity, sex, gender, age, or disability, alone or in combination); and

10

e.   The requirements of this Order;

3.   Documenting, for each Output, any Respondent's determination of whether
the Output is Inaccurate and any actions that Operators take in whole or in
part because of the Output;

4.   Periodically, and at least annually, reviewing actions taken by any Operators
in response to Outputs, updating the content of training for Operators to
address systemic Operator errors identified by periodic reviews, and, if there
is reason to believe that an Operator's operation of the Automated Biometric
Security or Surveillance System increases risk to consumers, or if an Operator
fails to comply with the requirements of this Order, terminating such
Operator's operation of the Automated Biometric Security or Surveillance
System;

5.   Developing, implementing, and maintaining policies and procedures designed
to ensure that Respondents have a reasonable basis for enrolling each
consumer's Biometric Information in any Gallery;

6.   Implementing and maintaining policies and procedures to ensure that samples
of Biometric Information used in connection with the Automated Biometric
Security or Surveillance System do not increase the likelihood of Inaccurate
Outputs, including by:

a.   Developing, implementing, and enforcing written quality standards for
Biometric Information to be used in connection with the Automated
Biometric Security or Surveillance System, taking into account the nature
of the Automated Biometric Security or Surveillance System, the manner
in which the Biometric Information is captured, and characteristics of
Biometric Information that could affect the accuracy of the Automated
Biometric Security or Surveillance System;

b.   To the extent that deployment of the Automated Biometric Security or
Surveillance System entails the creation of a Gallery, periodically, and at
least monthly, reviewing such Gallery to identify and, as soon as
practicable, remove samples of Biometric Information that (1) have been
associated with two or more Inaccurate Outputs, including Outputs that
were determined to be Inaccurate based on investigations conducted in
response to consumer complaints pursuant to sub-Provision IV.C of this
Order;  (2) do not meet the quality standards referenced in sub-Provision
III.D.6.a; (3) are required to be deleted pursuant to Provision V of this
Order, entitled "Required Retention Limits for Biometric Information;" or
(4) have been enrolled without a reasonable basis or in violation of
policies and procedures implemented pursuant to sub-Provision III.D.5;

11

    c. Periodically, and at least annually, reviewing the means by which Biometric Information to be used in connection with the Automated Biometric Security or Surveillance System is captured, including the extent to which any software or hardware used to collect Biometric Information is functioning properly and are consistently capturing samples of Biometric Information that meet the quality standards developed and implemented pursuant to sub-Provision III.D.6.a and are not otherwise contributing to the generation of Inaccurate Outputs; and

   7. Conducting documented testing of the Automated Biometric Security or Surveillance System prior to deployment and at least once every twelve (12) months thereafter. Such testing must be conducted with the Affirmative Express Consent of individuals whose Biometric Information will be used for testing and must:

    a. Be conducted under conditions that materially replicate the conditions under which the Automated Biometric Security or Surveillance System is actually used, taking into account factors that affect the accuracy of the type of Automated Biometric Security or Surveillance System to be tested, the means by which Biometric Information to be used in connection with the Automated Biometric Security or Surveillance System is captured, and the roles of Operators;

    b. Determine the rate at which the Automated Biometric Security or Surveillance System's Outputs are Inaccurate, including by assessing the extent to which the Outputs can be verified using evidence or information other than an Output of an Automated Biometric Security or Surveillance System. For example, if an Output indicates the identity of an individual, the Output is verified if it is corroborated by a review of government-issued identification documents;

    c. Identify factors that cause or contribute to Inaccurate Outputs; and

    d. Assess and measure any statistically significant variation in the Automated Biometric Security or Surveillance System's rate of Inaccurate Outputs depending on demographic characteristics of the consumers whose Biometric Information is analyzed or used, such as race, ethnicity, sex, gender, age, or disability (alone or in combination).

E. Evaluate and adjust the Program in light of any circumstance that Respondents know or have reason to know may materially affect the Program's effectiveness. At a minimum, every twelve (12) months, each Covered Business must evaluate the effectiveness of the Program in light of the System Assessment and the results of all monitoring, testing, and documentation conducted pursuant to the Program. Respondents must implement modifications to substantially and timely remediate any identified risks that consumers may experience physical, financial, or reputational injury, stigma, or severe emotional

distress, including in connection with communications of the Outputs to law enforcement or other third parties, taking into account the extent to which such harms are likely to disproportionately affect particular demographics of consumers based on race, ethnicity, gender, sex, age, or disability (alone or in combination);

F.  Provide the written System Assessment and Program, and any evaluations thereof or updates thereto, to Respondents' board of directors or governing body or, if no such board or equivalent governing body exists, to a senior officer of Respondents responsible for the Program at least once every twelve (12) months; and

G.  Not deploy or discontinue deployment of an Automated Biometric Security or Surveillance System if:

1.  Respondents do not possess competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that Outputs of the Automated Biometric Security or Surveillance System are likely to be accurate. For purposes of this Provision III, competent and reliable scientific evidence means tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons and are generally accepted in the profession to yield accurate and reliable results; or

2.  Respondents have reason to believe, taking into account the System Assessment, the Program, all consumer complaints, and all monitoring, testing, documentation, and evaluations conducted pursuant to the Program, that:

a.  Respondents' use of the Automated Biometric Security or Surveillance System creates or contributes to a risk that Inaccurate Outputs will cause consumers to experience substantial physical, financial, or reputational injury, discrimination based on race, ethnicity, gender, sex, age, or disability, stigma, or severe emotional distress to consumers, including in connection with communications of the Outputs to law enforcement or other third parties, taking into account the extent to which such harms are likely to disproportionately affect consumers based on race, ethnicity, gender, sex, age, or disability; and

b.  The identified risks are not substantially and timely eliminated by modifications to the Program.

IV.     **Mandatory Notice and Complaint Procedures for Automated Biometric Security or Surveillance Systems**

**IT IS FURTHER ORDERED** that Respondents, for any Covered Business, in connection with the operation of any retail store or retail pharmacy or online retail platform,

must not use any Automated Biometric Security or Surveillance System in connection with
Biometric Information collected from or about consumers of such retail store, retail pharmacy, or
online retail platform, unless (1) use of the Automated Biometric Security or Surveillance
System is not prohibited pursuant to Provision I of this Order entitled Use of Facial Recognition
or Analysis Systems Prohibited and (2) Respondents, prior to implementing any such Automated
Biometric Security or Surveillance System, establish and implement, and thereafter maintain,
procedures to provide consumers with notice and a means of submitting complaints related to
Outputs of the Automated Biometric Security or Surveillance System.  Specifically, Respondents
must:

A.  Provide written notice to all consumers who will have their Biometric Information
    enrolled in any Gallery used in conjunction with an Automated Biometric Security or
    Surveillance System, unless Respondents are unable to provide the notice due to safety
    concerns or the nature of a security incident that forms the basis for enrollment.
    Respondents shall provide such notice prior to or promptly after enrollment, and the
    notice shall include:

    1.  An explanation for the reasonable basis (as described in sub-Provision III.D.5)
        for enrollment in the Gallery, including a description of any security incident
        that provided that basis;

    2.  Instructions about how to obtain a copy of the sample of Biometric
        Information that was collected in order to enroll the consumer, which
        Respondents must make available upon request so long as Respondents retain
        said sample;

    3.  The length of time for which Respondent will retain the consumer's Biometric
        Information in the Gallery; and

    4.  An email address, online form, mailing address, and telephone number to
        which consumers can direct complaints or inquiries about their enrollment in
        the Gallery; the Automated Biometric Security or Surveillance System; or
        retention of their Biometric Information.

B.  Provide written notice to all consumers with respect to whom Respondents, in connection
    with an Output, take an action that could result in physical, financial, or reputational
    harm to the consumers, including in connection with communications of the Output to
    law enforcement or other third parties, unless Respondents are unable to provide the
    notice due to safety concerns or the nature of a security incident relating to the Output.
    Respondents shall provide such notice prior to taking, or, if prior notice is infeasible, at
    the time of taking an action, and the notice shall include:

    1.  The date, approximate time, and location of the Output;

    2.  A description of the action or actions taken;

14

3. An explanation of how that action relates to the Output; and

4. An email address, online form, mailing address, and telephone number to which consumers can direct complaints or inquiries about the Output; the Automated Biometric Security or Surveillance System that generated the Output; or the use, sharing, or retention of their Biometric Information.

C. Investigate each complaint to (1) determine whether the relevant Output was an Inaccurate Output, and, if so, identify any factors that likely contributed to the generation of an Inaccurate Output; and (2) assess whether Operators responded to the Output in a manner that was appropriate and consistent with the requirements of this Order; and

D. Respond to each consumer complaint relating to the Automated Biometric Security or Surveillance System by:

1. Within seven (7) days of receiving the complaint, providing written confirmation of receipt to the consumer who submitted the complaint. Such written confirmation should be provided using the same means of communication that the consumer used to submit the complaint, or by another means selected by the consumer during the complaint submission process, and should state that Respondents will investigate the consumer's complaint and provide its conclusions within thirty (30) days;

2. Within thirty (30) days of providing the written confirmation, providing a written response to the consumer who submitted the complaint. Such written response must be provided using the same means of communication as the written confirmation and must (1) state whether the Output was determined to be an Inaccurate Output and the basis for such a determination; and (2) describe in general terms actions taken in response to the complaint.

## V.      Required Retention Limits for Biometric Information

**IT IS FURTHER ORDERED** that Respondent, for any Covered Business, in connection with the operation of any retail store, retail pharmacy, or online retail platform must, prior to implementing any Automated Biometric Security or Surveillance System, develop and implement, for each type of Biometric Information from or about consumers of such physical retail location or online retail platform that is collected in whole or in part for use in connection with any Automated Biometric Security or Surveillance System, a written retention schedule setting forth:

A. All purposes and business needs for which the Covered Business collects or uses the type of Biometric Information;

B. A timeframe for deletion of the Biometric Information that is no greater than five (5) years, except to the extent that retention beyond five years is required by law or Respondents have obtained Affirmative Express Consent for the retention within the

previous five (5) years, and precludes retention beyond what is reasonably necessary to achieve the purpose or purposes and serve the business needs for which it was collected; and

C.  The basis for the timeframe for deletion of the Biometric Information, including any foreseeable effect on the likelihood of Inaccurate Outputs of the passage of time since a given sample of the type of Biometric Information was collected or enrolled in a Gallery.

## VI.    Disclosure of Automated Biometric Security or Surveillance Systems

**IT IS FURTHER ORDERED** that Respondents, for any Covered Business, in connection with the operation of any retail store, retail pharmacy, or online retail platform, must, within thirty (30) days after the effective date of this Order, post Clear and Conspicuous notices disclosing the Covered Business's use of any Automated Biometric Security or Surveillance System in connection with Biometric Information collected from or about consumers of the physical retail location or online retail platform.  Such notices must be posted in each physical retail location, and on each website, mobile application, or online service on or through which Biometric Information from or about consumers is collected or used in whole or in part for the purpose of operating an Automated Biometric Security or Surveillance System, and must include, as to each such location, website, mobile application, or online service:

A.  The specific types of Biometric Information that are collected in whole or in part for the purpose of operating an Automated Biometric Security or Surveillance System;

B.  The types of Outputs that are generated by the Automated Biometric Security or Surveillance Systems;

C.  All purposes for which the Covered Business uses each Automated Biometric Security or Surveillance System or its Outputs, including actions that the Covered Business may take on the basis of Outputs; and

D.  The timeframe for deletion of each type of Biometric Information used, as established pursuant to Provision V of this Order, entitled "Required Retention Limits for Biometric Information."

## VII.    Prohibition Against Misrepresentations

**IT IS FURTHER ORDERED** that Respondents and Respondents' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with any product or service, must not misrepresent in any manner, expressly or by implication, the extent to which Respondents maintain and protect the privacy, security, confidentiality, or integrity of Covered Information, including, but not limited to, misrepresentations related to:

A.  Respondents' privacy and security measures to prevent unauthorized access to Covered Information;

16

B. Respondents' privacy and security measures to honor the privacy choices exercised by consumers;

C. Respondents' collection, maintenance, use, disclosure, or deletion of Covered Information; or

D.  The extent to which Respondents make or have made Covered Information accessible to any third parties.

### VIII.   Mandated Information Security Program for Covered Businesses

**IT IS FURTHER ORDERED** that Respondents, for any Covered Business, in connection with the collection, maintenance, use, or disclosure of, or provision of access to, Covered Information, must each, within 90 days of the effective date of this Order, establish and implement, and thereafter maintain, a comprehensive information security program ("Information Security Program") that protects the security, confidentiality, and integrity of such Covered Information.  To satisfy this requirement, each Covered Business must, at a minimum:

A. Document in writing the content, implementation, and maintenance of the Information Security Program;

B. Provide the written Information Security Program and any evaluations thereof or updates thereto to the Covered Business' board of directors or governing body or, if no such board or equivalent governing body exists, to a senior officer of the Covered Business responsible for the Covered Business's Information Security Program at least once every twelve (12) months and promptly (not to exceed 30 days) after a Covered Incident affecting 500 or more consumers;

C. Designate a qualified employee or employees, who report(s) directly to the Executive Leadership Team (including the Chief Executive Officer, Chief Information Officer, and Chief Legal Officer) to coordinate and be responsible for the Information Security Program and keep the Executive Leadership Team and Board of Directors informed of the Information Security Program, including all actions and procedures implemented to comply with the requirements of this Order, and any actions and procedures to be implemented to ensure continued compliance with this Order;

D. Assess and document, at least once every twelve (12) months and promptly (not to exceed 30 days) following a Covered Incident affecting 100 or more consumers, internal and external risks to the security, confidentiality, or integrity of Covered Information that could result in the (1) unauthorized collection, maintenance, alteration, destruction, use, disclosure of, or provision of access to, Covered Information; or the (2) misuse, loss, theft, or other compromise of such information;

E. Design, implement, maintain, and document safeguards that control for the internal and external risks Covered Businesses identify to the security, confidentiality, or integrity of

17

Covered Information identified in response to sub-Provision D of this Provision.  Each safeguard must be based on the volume and sensitivity of the Covered Information that is at risk, and the likelihood that the risk could be realized and result in the (1) unauthorized collection, maintenance, alteration, destruction, use, disclosure of, or provision of access to, Covered Information; or the (2) misuse, loss, theft, or other compromise of such information.  Such safeguards must also include:

1. Training of all employees, at least once every twelve (12) months, on how to safeguard Covered Information including, for information security personnel, security updates and training sufficient to address relevant security risks, and verifying that key information security personnel take steps to maintain current knowledge of changing information security threats and countermeasures;

2. Documenting in writing the content, implementation, and maintenance of an incident response plan designed to ensure the identification of, investigation of, and response to the unauthorized access to Covered Information. Respondents shall revise and update this incident response plan to adapt to material changes to their assets or networks;

3. Implementing technical measures to log and monitor all networks and assets for anomalous activity and active threats. Such measures shall require Respondents to determine baseline system activity and identify and respond to anomalous events and unauthorized attempts to access or exfiltrate Covered Information;

4. Policies and procedures to minimize data collection, storage, and retention, including data deletion or retention policies and procedures;

5. Implementing data access controls for all assets (including databases) storing Covered Information and technical measures, policies, and procedures to minimize or prevent online attacks resulting from the misuse of valid credentials, including:  (a) restricting inbound and outbound connections; (b) requiring and enforcing strong passwords or other credentials; (c) preventing the reuse of known compromised credentials to access Covered Information; (d) implementing automatic password resets for known compromised credentials; and (e) limiting employee access to what is needed to perform that employee's job function;

6. Requiring multi-factor authentication methods for all employees, contractors, and affiliates in order to access any assets (including databases) storing Covered Information. Such multi-factor authentication methods for all employees, contractors, and affiliates should not include telephone or SMS-based authentication methods and must be resistant to phishing attacks. Respondents may use equivalent, widely adopted industry authentication options that are not multi-factor, if the person responsible for the Information

18

Security Program under sub-Provision C of this Provision: (1) approves in writing the use of such equivalent authentication options; and (2) documents a written explanation of how the authentication options are widely adopted and at least equivalent to the security provided by multi-factor authentication;

7. Developing and implementing configuration standards to harden system components against known threats and vulnerabilities. New system components shall not be granted access to any Covered Businesses' network, resources, or Covered Information until they meet Respondents' configuration standards;

8. Encryption of, at a minimum, all Social Security numbers, passport numbers, financial account information, tax information, dates of birth associated with a user's account, Health Information, and user account credentials while in transit or at rest on each Covered Businesses' computer networks, including but not limited to cloud storage;

9. Policies and procedures to ensure that all networks, systems, and assets with access to Covered Information within the Covered Businesses' custody or control are securely installed and inventoried at least once every twelve (12) months;

10. Implementing vulnerability and patch management measures, policies, and procedures that (a) require confirmation that any directives to apply patches or remediate vulnerabilities are received and completed and (b) include timelines for addressing vulnerabilities that account for the severity and exploitability of the risk implicated; and

11. Enforcing policies and procedures to ensure the timely investigation of data security events and the timely remediation of critical and high-risk security vulnerabilities.

F. Assess, at least once every twelve (12) months and promptly (not to exceed 30 days) following a Covered Incident affecting 100 or more consumers, the sufficiency of any safeguards in place to address the risks to the security, confidentiality, or integrity of Covered Information, and modify the Information Security Program based on the results;

G. Test and monitor the effectiveness of the safeguards in place at least once every twelve (12) months and promptly (not to exceed 30 days) following a Covered Incident affecting 100 or more consumers, and modify the Information Security Program based on the results as necessary. Such testing and monitoring must include: (1) vulnerability testing of each Covered Business' network and applications once every four (4) months and promptly (not to exceed 30 days) after a Covered Incident; and (2) penetration testing of each Covered Business' network(s) and applications at least once every twelve (12) months and promptly (not to exceed 30 days) after a Covered Incident;

19

H. Evaluate and adjust the Information Security Program in light of any material changes to a Covered Business' operations or business arrangements, a Covered Incident affecting 100 or more consumers, new or more efficient technological or operational methods to control for the risks identified in sub-Provision D of this Provision, or any other circumstances that a Covered Business or its officers, agents, or employees know or have reason to know may have a material impact on the effectiveness of the Information Security Program or any of its individual safeguards.  At a minimum, each Covered Business must evaluate the Information Security Program at least once every twelve (12) months and modify the Information Security Program, if appropriate, based on the results;

I. Select and retain Vendors capable of safeguarding Covered Information they access through or receive from each Covered Business, including by implementing and maintaining a uniform process that is fully documented in writing to conduct risk assessments for each Vendor, and contractually require Vendors to implement and maintain safeguards sufficient to address the internal and external risks to the security, confidentiality, or integrity of Covered Information.  The uniform process must include a review and analysis of the information and documentation obtained about each Vendor pursuant to this Provision.  The level of the assessment for each Vendor should be commensurate with the risk it poses to the security of Covered Information;

J. Require each Vendor agree by contract (upon renewal or new engagement or, in any event, within 180 days of the effective date of this Order) to:

   1. Develop and implement policies and procedures for the prompt remediation and investigation of any incident that results in the Vendor or Covered Business notifying, pursuant to an applicable statutory or regulatory requirement, any U.S. federal, state, or local government entity that information of or about an individual consumer was, or is reasonably believed to have been, accessed, acquired, or publicly exposed without authorization; and

   2. Notify the Covered Business in writing as soon as possible, and in any event no later than seventy-two (72) hours, if the Vendor has reason to believe that any person has accessed, exfiltrated, or otherwise obtained without authorization Covered Information that the Vendor obtained from the Covered Business.

K. Obtain or possess for each Vendor, within 180 days of the effective date of this Order, documentation regarding the Vendor's information security program that is material to the security of Covered Information within the possession, custody, or control of the Covered Business, including, without limitation, documentation of the Vendor's cybersecurity risk assessment conducted within the last twelve (12) months.  The Covered Business must be in possession of such documentation before it provides the Vendor with access to Covered Information;

L. Determine in writing, at least once every twenty-four (24) months, whether there has been a material change to the Vendor's information security program.  If there has been a

20

material change, the Covered Business must obtain or possess new documentation regarding the Vendor's information security program that is material to the security of Covered Information within the possession, custody, or control of the Covered Business;

M. Maintain in one or more central repositories all documentation about or provided by each Vendor pursuant to sub-Provisions J, K, and L of this Provision, including but not limited to each contract with a Vendor, for a period of five (5) years from when it was obtained or provided. This sub-Provision is in addition to and not in lieu of the Provision entitled Recordkeeping;

N. At least once every twenty-four (24) months, and promptly following a Covered Incident affecting 100 or more consumers involving a Vendor or determination of a material change to a Vendor's information security program under sub-Provision L of this Provision, conduct written reassessments of each Vendor (or, in the case of a Covered Incident affecting 100 or more consumers, each relevant Vendor) to determine the continued adequacy of their safeguards to control the internal and external risks to the security of Covered Information and document the basis for the Covered Business's determination as to whether each Vendor's safeguards are adequate.  The level of the assessment for each Vendor should be commensurate with the risk it poses to the security of Covered Information; and

O. Maintain in one or more central repositories all documentation created by the Covered Business pursuant to sub-Provision N of this Provision for a period of five (5) years from when it was created. This sub-Provision is in addition to and not in lieu of the Provision entitled Recordkeeping.

### IX.     Third Party Information Security Assessments for Covered Businesses

**IT IS FURTHER ORDERED** that Respondents must obtain initial and biennial assessments ("Assessments"):

A. The Assessments must be obtained from a qualified, objective, independent third-party professional ("Assessor"), who:  (1) uses procedures and standards generally accepted in the profession; (2) conducts an independent review of the Information Security Program; and (3) retains all documents relevant to each Assessment for 5 years after completion of such Assessment and will provide such documents to the Commission within 10 days of receipt of a written request from a representative of the Commission.  No documents may be withheld by the Assessor on the basis of a claim of confidentiality, proprietary or trade secrets, work product protection, attorney-client privilege, statutory exemption, or any similar claim.

B. For each Assessment, Respondents must provide the Associate Director for Enforcement for the Bureau of Consumer Protection at the Federal Trade Commission with the name, affiliation, and qualifications of the proposed Assessor, whom the Associate Director shall have the authority to approve in their sole discretion.

C.  The reporting period for the Assessments must cover:  (1) the first 180 days after the Mandated Information Security Program for Covered Businesses required by Provision VIII of this Order has been put in place for the initial Assessment; and (2) each two-year period thereafter for 20 years after issuance of the Order for the biennial Assessments.

D.  Each Assessment must, for the entire assessment period:

1.  Determine whether Respondents have implemented and maintained the Information Security Program required by the Provision entitled Mandated Information Security Program for Covered Businesses;

2.  Assess the effectiveness of Respondents' implementation and maintenance of sub-Provisions A-O of the Provision entitled Mandated Information Security Program for Covered Businesses;

3.  Identify any gaps or weaknesses in, or instances of material noncompliance with, the Information Security Program;

4.  Address the status of gaps or weaknesses in, or instances of material noncompliance with, the Information Security Program that were identified in any prior Assessment required by this Order; and

5.  Identify specific evidence (including, but not limited to, documents reviewed, sampling and testing performed, and interviews conducted) examined to make such determinations, assessments, and identifications, and explain why the evidence that the Assessor examined is (a) appropriate for assessing an enterprise of the business's size, complexity, and risk profile; and (b) sufficient to justify the Assessor's findings.  No finding of any Assessment shall rely primarily on assertions or attestations by Respondents' management.  The Assessment must be signed by the Assessor, state that the Assessor conducted an independent review of the Information Security Program and did not rely primarily on assertions or attestations by Respondents' management, and state the number of hours that each member of the assessment team worked on the Assessment.  To the extent any Respondent revises, updates, or adds one or more safeguards required under the Provision entitled Mandated Information Security Program for Covered Businesses in the middle of an Assessment period, the Assessment must assess the effectiveness of the revised, updated, or added safeguard(s) for the time period in which it was in effect, and provide a separate statement detailing the basis for each revised, updated, or additional safeguard.

E.  Each Assessment must be completed within 60 days after the end of the reporting period to which the Assessment applies.  Unless otherwise directed by a Commission representative in writing, Respondents must submit an unredacted copy of the initial Assessment and a proposed redacted copy suitable for public disclosure of the initial Assessment to the Commission within 10 days after the Assessment has been completed via email to DEbrief@ftc.gov or by overnight courier (not the U.S. Postal Service) to:

Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin, "*In re Rite Aid Corporation*, FTC File No. C-4308." Respondents must retain an unredacted copy of each subsequent biennial Assessment as well as a proposed redacted copy of each subsequent biennial Assessment suitable for public disclosure until the Order is terminated and must provide each such Assessment to the Associate Director for Enforcement within ten (10) days of request. The initial Assessment and any subsequent biennial Assessment provided to the Commission must be marked, in the upper right-hand corner of each page, with the words "Information Security Program Assessment" in red lettering.

## X.     Cooperation with Third-Party Information Security Assessor

**IT IS FURTHER ORDERED** that, Respondents, whether acting directly or indirectly, in connection with any Assessment required by the Provision entitled Third Party Information Security Assessments for Covered Businesses must:

A.  Provide or otherwise make available to the Assessor all information and material in their possession, custody, or control that is relevant to the Assessment for which there is no reasonable claim of privilege;

B.  Provide or otherwise make available to the Assessor information about Respondents' networks and all of Respondents' information technology assets so that the Assessor can determine the scope of the Assessment, and visibility to those portions of the networks and information technology assets deemed in scope; and

C.  Disclose all material facts to the Assessor, and not misrepresent in any manner, expressly or by implication, any fact material to the Assessor's:  (1) determination of whether Respondents have implemented and maintained the Mandated Information Security Program for Covered Businesses; (2) assessment of the effectiveness of the Respondents' implementation and maintenance of sub-Provisions A-O of the required Mandated Information Security Program for Covered Businesses; or (3) identification of any gaps or weaknesses in, or instances of material noncompliance with, the Mandated Information Security Program for Covered Businesses.

## XI.     Annual Certification

**IT IS FURTHER ORDERED** that Respondents must:

A.  One year after the issuance date of this Order, and each year thereafter, provide the Commission with a certification from Corporate Respondents' Chief Executive Officer, _____, or if Mr./Ms. _____ no longer serves as Respondents' Chief Executive Officer, President, or such other officer (regardless of title) that is designated in that Respondent's Bylaws or resolution of the Board of Directors as having the duties of the principal executive officer of Respondent, then a senior corporate manager, or, if no such senior corporate manager exists, a senior officer responsible for Respondents'

Information Security Program that: (1) each Covered Business has established, implemented, and maintained the requirements of this Order; (2) each Covered Business is not aware of any material noncompliance that has not been (a) corrected or (b) disclosed to the Commission; and (3) includes a brief description of all Covered Incidents affecting 100 or more consumers that Respondents verified or confirmed during the certified period.  The certification must be based on the personal knowledge of Mr./Ms._____, the senior corporate manager, senior officer, or subject matter experts upon whom Mr./Ms._____, the senior corporate manager, or senior officer reasonably relies in making the certification.

B. Unless otherwise directed by a Commission representative in writing, submit all annual certifications to the Commission pursuant to this Order via email to DEbrief@ftc.gov or by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin, "*In re Rite Aid Corporation*, FTC File No. C-4308."

## XII.    Covered Incident Reports

**IT IS FURTHER ORDERED** that, within 10 days of any notification to a United States federal, state, or local entity of a Covered Incident affecting 500 or more consumers, Respondents, for any Covered Business, must submit a report to the Commission. The report must include, to the extent possible:

A. The date, estimated date, or estimated date range when the Covered Incident occurred;

B. A description of the facts relating to the Covered Incident, including the causes and scope of the Covered Incident, if known;

C. A description of each type of information that was affected by the Covered Incident;

D. The number of consumers whose information was affected by the Covered Incident;

E. The acts that each Covered Business has taken to date to remediate the Covered Incident and protect Covered Information from further exposure or access, and protect affected individuals from identity theft or other harm that may result from the Covered Incident; and

F. A representative copy of each materially different notice sent by each Covered Business to consumers or to any U.S. federal, state, or local government entity regarding the Covered Incident.

Unless otherwise directed by a Commission representative in writing, all Covered Incident reports to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of

Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin, "*In re Rite Aid Corporation*, FTC File No. C-4308."

## XIII.   Acknowledgments of the Order

**IT IS FURTHER ORDERED** that Respondents obtain acknowledgments of receipt of this Order:

A.  Each Respondent, within ten (10) days after the effective date of this Order, must submit to the Commission an acknowledgment of receipt of this Order.

B.  For twenty (20) years after the issuance date of this Order, each Respondent must deliver a copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2) all of Respondents' current and future subsidiaries that own, control, or operate one or more stores or online retail platforms; (3) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (4) any business entity resulting from any change in structure as set forth in the Provision entitled Compliance Reports and Notices.  Delivery must occur within ten (10) days after the effective date of this Order for current personnel.  For all others, delivery must occur before they assume their responsibilities.

C.  From each individual or entity to which Respondents delivered a copy of this Order, Respondents must obtain, within thirty (30) days, a signed and dated acknowledgment of receipt of this Order.

## XIV. Compliance Reports and Notices

**IT IS FURTHER ORDERED** that Respondents make timely submissions to the Commission:

A.  One year after the issuance date of this Order, each Respondent must submit a compliance report, sworn under penalty of perjury, in which each Respondent must:  (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission, may use to communicate with Respondent; (b) identify all of that Respondent's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business; (d) describe in detail whether and how that Respondent is in compliance with each Provision of this Order, including a discussion of all of the changes the Respondent made to comply with the Order; and (e) provide a copy of each Acknowledgment of the Order obtained pursuant to this Order, unless previously submitted to the Commission;

B.  Each Respondent must submit a compliance notice, sworn under penalty of perjury, within fourteen (14) days of any change in (a) any designated point of contact; or (b) the

structure of such Respondent or any entity that such Respondent has any ownership
interest in or controls directly or indirectly that may affect compliance obligations arising
under this Order, including:  creation, merger, sale, or dissolution of the entity or any
subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order;

C.  Each Respondent must submit notice of the filing of any bankruptcy petition, insolvency
proceeding, or similar proceeding by or against such Respondent within fourteen (14)
days of its filing;

D.  Any submission to the Commission required by this Order to be sworn under penalty of
perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by
concluding:  "I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct.  Executed on:  _____" and supplying the
date, signatory's full name, title (if applicable), and signature;

E.  Unless otherwise directed by a Commission representative in writing, all submissions to
the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by
overnight courier (not the U.S. Postal Service) to:  Associate Director for Enforcement,
Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue
NW, Washington, DC  20580.  The subject line must begin: "In re Rite Aid Corporation,
FTC File No. C-4308".

## XV. Recordkeeping

**IT IS FURTHER ORDERED** that Respondents must create certain records for twenty (20)
years after the issuance date of the Order, and retain each such record for five (5) years, unless
otherwise specified below. Specifically, Respondents must create and retain the following
records:

A.  Accounting records showing the revenues from all goods or services sold, the costs
incurred in generating those revenues, and resulting net profit or loss;

B.  Personnel records showing, for each person providing services in relation to any aspect of
the Order, whether as an employee or otherwise, that person's:  name; addresses;
telephone numbers; job title or position; dates of service; and (if applicable) the reason
for termination;

C.  Copies or records of all consumer complaints concerning the subject matter of this Order,
whether received directly or indirectly, such as through a third party, and any response;

D.  All records necessary to demonstrate full compliance with each Provision of this Order,
including all submissions to the Commission;

E.  For five (5) years after the date of preparation of each System Assessment required by
this Order, all materials relied upon to prepare the System Assessment, including all

plans, test results, reports, studies, reviews, audits, policies, training materials, and assessments, and any other materials concerning Respondents' compliance with related Provisions of this Order, for the compliance period covered by such System Assessment;

F.   A copy of each widely disseminated and materially different representation by Defendants that describes the extent to which Defendants maintains or protects the privacy, security, availability, confidentiality, or integrity of any Covered Information, including any representation concerning a change in any website or other service controlled by Respondents that relates to privacy, security, availability, confidentiality, or integrity of Covered Information;

G.   For five (5) years after the date of preparation of each Assessment by the Assessor, as those terms are defined in Provision IX, all materials and evidence that the Assessor considered, reviewed, relied upon or examined to prepare the Assessment, whether prepared by or on behalf of Respondents, including all plans, reports, studies, reviews, audits, audit trails, policies, training materials, and assessments, and any other materials concerning compliance with related Provisions of this Order, for the compliance period covered by such Assessment;

H.   For five (5) years from the date received, copies of all subpoenas and other communications with law enforcement, if such communications relate to Respondents' compliance with this Order; and

I.   For five (5) years from the date created or received, all records, whether prepared by or on behalf of a Respondent, that tend to show any lack of compliance by a Respondent with this Order.

## XVI. Compliance Monitoring

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Respondents' compliance with this Order:

A.   Within fourteen (14) days of receipt of a written request from a representative of the Commission, each Respondent must:  submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce records for inspection and copying.  The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.   For matters concerning this Order, representatives of the Commission are authorized to communicate directly with each Respondent.  Respondents must permit representatives of the Commission to interview anyone affiliated with any Respondent who has agreed to such an interview.  The interviewee may have counsel present.

C.   The Commission may use all other lawful means, including posing through its

representatives as consumers, suppliers, or other individuals or entities, to Respondents or any individual or entity affiliated with Respondents, without the necessity of identification or prior notice.  Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XVII. Modification of Original Decision and Order

**IT IS FURTHER ORDERED** that this Decision and Order supersedes the Decision and Order the Commission previously issued in *In re Rite Aid Corporation*, C-4308, 150 F.T.C. 694 (Nov. 12, 2010).

## XVIII. Order Effective Dates

**IT IS FURTHER ORDERED** that this Order is final and effective upon the date of its publication on the Commission's website (ftc.gov) as a final order.  This Order will terminate twenty (20) years from the date of its issuance (which date may be stated at the end of this Order, near the Commission's seal), or twenty (20) years from the most recent date that the United States or the Commission files a complaint (with or without an accompanying settlement) in federal court alleging any violation of this Order, whichever comes later; *provided, however,* that the filing of such a complaint will not affect the duration of:

A.  Any Provision in this Order that terminates in less than twenty (20) years;

B.  This Order's application to any Respondent that is not named as a defendant in such complaint; and

C.  This Order if such complaint is filed after the Order has terminated pursuant to this Provision.

*Provided, further,* that if such complaint is dismissed or a federal court rules that the Respondent did not violate any Provision of the Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Order will terminate according to this Provision as though the complaint had never been filed, except that the Order will not terminate between the date such complaint is filed and the later of the deadline for appealing such dismissal or ruling and the date such dismissal or ruling is upheld on appeal.

By the Commission.

April Tabor
Secretary

SEAL:
ISSUED:

# EXHIBIT B

## Complaint

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FEDERAL TRADE COMMISSION,

                    Plaintiff,

            v.

RITE AID CORPORATION, a corporation,

and

RITE AID HDQTRS. CORP., a corporation,

                    Defendants.

Case No. 2:23-cv-5023

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF**

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.       The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), which authorizes the FTC to seek, and the Court to order, permanent injunctive relief and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## SUMMARY OF THE CASE

2.       Rite Aid Corporation, through its wholly owned subsidiaries including Rite Aid Hdqtrs. Corp. (together with Rite Aid Corporation, "Rite Aid"), operates thousands of retail pharmacy locations throughout the United States.  These locations sell a wide variety of products, including prescription and non-prescription medicines, medical supplies, groceries, cosmetics, and personal care items.

3.       From at least approximately October 2012 until July 2020, Rite Aid has used facial recognition technology in hundreds of its retail pharmacy locations to identify patrons that

1

it had previously deemed likely to engage in shoplifting or other criminal behavior in order to
"drive and keep persons of interest out of [Rite Aid's] stores."  The technology generated alerts
sent to Rite Aid's employees, including by email or mobile phone application notifications
("match alerts"), indicating that individuals who had entered Rite Aid stores were matches for
entries in Rite Aid's watchlist database.

4.      In whole or in part due to facial recognition match alerts, Rite Aid employees
took action against the individuals who had triggered the supposed matches, including subjecting
them to increased surveillance; banning them from entering or making purchases at the Rite Aid
stores; publicly and audibly accusing them of past criminal activity in front of friends, family,
acquaintances, and strangers; detaining them or subjecting them to searches; and calling the
police to report that they had engaged in criminal activity.  In numerous instances, the match
alerts that led to these actions were false positives (i.e., instances in which the technology
incorrectly identified a person who had entered a store as someone in Rite Aid's database).

5.      As described in more detail below, Rite Aid failed to take reasonable measures to
prevent harm to consumers from its use of facial recognition technology.  Among other things,
Rite Aid failed to consider or address foreseeable harms to consumers flowing from its use of
facial recognition technology, failed to test or assess the technology's accuracy before or after
deployment, failed to enforce image quality standards that were necessary for the technology to
function accurately, and failed to take reasonable steps to train and oversee the employees
charged with operating the technology in Rite Aid stores.

6.      Rite Aid's failures caused and were likely to cause substantial injury to
consumers, and especially to Black, Asian, Latino, and women consumers.

2

7.      Rite Aid is the subject of a 2010 order previously issued by the FTC for alleged

violations of Section 5(a) of the FTC Act.  *See* Ex. A, *In the Matter of Rite Aid Corporation*, C-

4308, 150 F.T.C. 694 (Nov. 12, 2010) (Decision and Order) ("Commission Order" or "2010

Order").  Rite Aid violated provisions in the 2010 Order requiring it to (1) implement and

maintain a comprehensive information security program and (2) retain documents relating to its

compliance with that provision.  Specifically, Rite Aid routinely failed to use reasonable steps in

selecting and retaining service providers capable of appropriately safeguarding personal

information they received from Rite Aid; require service providers by contract to implement and

maintain appropriate safeguards for personal information they received from Rite Aid; and

maintain written records relating to its information security program.  Furthermore, Rite Aid

failed to produce documents relating to its compliance with the 2010 Order, including documents

that contradict, qualify, or call into question its compliance.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1337(a), and 1345.

9.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and

(d), and 15 U.S.C. § 53(b), because Rite Aid has its principal place of business in this District,

because Rite Aid transacts business in this District, and because a substantial part of the events

or omissions giving rise to the claims occurred in this District.

10.     Defendants Rite Aid Corporation and Rite Aid Hdqtrs. Corp. filed petitions for

relief under Chapter 11 of the Bankruptcy Code on October 15, 2023.  *See In re Rite Aid*

*Corporation*, Case No. 3:23-bk-18993 (Bankr. D.N.J.); *In re Rite Aid Hdqtrs. Corp.*, Case No.

3:23-bk-18999 (Bankr. D.N.J.).  These cases are being jointly administered in the lead case, *In re*

*Rite Aid Corporation*, Case No. 3:23-bk-18993 (Bankr. D.N.J.) (collectively, the "Bankruptcy

Cases").

11.     The FTC's commencement and prosecution of this action are actions to enforce

the FTC's police or regulatory power.  As a result, if the Bankruptcy Cases are pending as of the

date of filing of this Complaint, the FTC's commencement and prosecution of this action is

excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4).

## PLAINTIFF

12.     The FTC is an independent agency of the United States Government created by

the FTC Act, which authorizes the FTC to commence this district court civil action by its own

attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C.

§ 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

## DEFENDANTS

13.     Rite Aid Corporation is a Delaware corporation with its principal office or place

of business at 1200 Intrepid Ave., 2nd Floor, Philadelphia, Pennsylvania.  It conducts business

through several wholly owned subsidiaries.  Rite Aid Corporation transacts or has transacted

business in this District and throughout the United States.

14.     Rite Aid Hdqtrs. Corp. is a Delaware corporation with its principal office or place

of business at 1200 Intrepid Ave., 2nd Floor, Philadelphia, Pennsylvania.  Rite Aid Hdqtrs. Corp.

is a wholly owned subsidiary of Rite Aid Corporation.  Rite Aid Hdqtrs. Corp. transacts or has

transacted business in this District and throughout the United States.

15.     Officers and employees of Rite Aid Corporation and Rite Aid Hdqtrs. Corp.

initiated, planned, directed, formulated policies for, and directly supervised and participated in

the implementation of facial recognition technology to keep persons of interest out of Rite Aid's

4

retail pharmacy locations. Regional and store-level employees worked at the direction of Rite

Aid Corporation and Rite Aid Hdqtrs. Corp. to operate the technology as part of their job duties.

## COMMON ENTERPRISE

16.     Defendants have operated as a common enterprise while engaging in the unlawful

acts and practices alleged below. Among other things, Defendants have conducted the business

practices described below through interrelated companies that have had common ownership,

officers, managers, business functions, and office locations and have filed joint financial

disclosures with the Securities and Exchange Commission. Because Defendants have operated

as a common enterprise, each of them is liable for the acts and practices alleged below.

## COMMERCE

17.     At all times relevant to this Complaint, Rite Aid has maintained a substantial

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

15 U.S.C. § 44.

## RITE AID'S USE OF FACIAL RECOGNITION TECHNOLOGY

18.     Rite Aid obtained its facial recognition technology from two third-party vendors

that operated and supported the technology on Rite Aid's behalf and at its direction in retail

stores. Rite Aid also contracted with one of its vendors to provide additional biometric

technologies for use in Rite Aid distribution centers.

19.     Most of the stores in which Rite Aid installed the technology were located in and

around New York City; Los Angeles; San Francisco; Philadelphia; Baltimore; Detroit; Atlantic

City; Seattle; Portland, Oregon; Wilmington, Delaware; and Sacramento, California.

20.    Rite Aid did not inform consumers that it used facial recognition technology.

Additionally, Rite Aid specifically instructed employees not to reveal Rite Aid's use of facial

recognition technology to consumers or the media.

### Rite Aid's Enrollment Practices

21.    In connection with its use of facial recognition technology, Rite Aid created, or

directed its facial recognition vendors to create, an enrollment database of images of individuals

whom Rite Aid considered "persons of interest," including because Rite Aid believed the

individuals had engaged in actual or attempted criminal activity at a Rite Aid physical retail

location or because Rite Aid had obtained law enforcement "BOLO" ("Be On the Look Out")

information about the individuals.  Individual entries in this database are referred to herein as

"enrollments."  Enrollments in the Rite Aid database included images of the individuals

("enrollment images") along with accompanying information, including, to the extent known,

individuals' first and last names, individuals' years of birth, and information related to criminal

or "dishonest" behavior in which individuals had allegedly engaged.

22.    Rite Aid regularly used low-quality enrollment images in its database.  Rite Aid

obtained enrollment images by, among other methods, excerpting images captured via Rite Aid's

closed-circuit television ("CCTV") cameras, saving photographs taken by the facial recognition

cameras, and by taking photographs of individuals using mobile phone cameras.  On a few

occasions, Rite Aid obtained enrollment images from law enforcement or from media reports.  In

some instances, Rite Aid employees enrolled photographs of individuals' driver's licenses or

other government identification cards or photographs of images displayed on video monitors.

23.    Rite Aid trained store-level security employees to "push for as many enrollments

as possible."  Rite Aid enrolled at least tens of thousands of individuals in its database.

24.     It was Rite Aid's general practice to retain enrollment images indefinitely.

**Rite Aid's Match Alert Practices**

25.     Cameras installed in Rite Aid's retail pharmacy locations that used facial

recognition technology would capture or attempt to capture images of all consumers as they

entered or moved through the stores ("live images").  Rite Aid's facial recognition technology

would then compare the live images to the enrollment images in Rite Aid's database to

determine whether the live image was a match for an enrolled individual.

26.     When Rite Aid's facial recognition technology determined that a live image

depicted the same person as an enrollment image, the technology generated a "match alert" that

was sent to store-level employees' Rite Aid-issued mobile phones.  As part of the comparison

process, Rite Aid's facial recognition technology generated "confidence scores" or "confidence

levels"—numerical values that expressed the system's degree of confidence that two images

were of the same person.  A higher score indicated a higher degree of confidence.  Rite Aid's

facial recognition technology generated a match alert when the confidence score associated with

a match was above a certain threshold that was selected by Rite Aid in consultation with its

vendors.

27.     However, match alerts provided to the store-level employees generally did not

include confidence scores, so the employees who operated Rite Aid's facial recognition

technology generally did not know the score associated with a given match alert.

28.     Generally, match alerts contained both the enrollment image and the live image,

as well as Rite Aid's instruction as to the action that Rite Aid's employees should take if the

individual entered the store.  Rite Aid instructed employees to take the stated action if the

employees believed the match to be accurate.

7

29.    Rite Aid's enrollments were assigned different match alert instructions depending

on the reason the individual was enrolled.  These instructions included (i) "Approach and

Identify," (ii) "Observe and Provide Customer Service," (iii) "Pharmacy Patient – Escort to

Pharmacy," and (iv) "911 Alert" or "Potentially Violent – Notify Law Enforcement and

Observe."  For enrollments with the instruction "911 Alert," employees were told to "call 911

and notify [the police that] a potentially violent or dangerous subject has entered the store."

30.    A majority of Rite Aid's facial recognition enrollments were assigned the match

alert instruction "Approach and Identify," which meant employees should approach the person,

ask the person to leave, and, if the person refused, call the police.

31.    Rite Aid's facial recognition technology generated thousands of false-positive

matches—that is, alerts that incorrectly indicated that a consumer was a "match" for an

enrollment in Rite Aid's database of individuals suspected or accused of wrongdoing.  Indeed,

despite a general failure to record the accuracy or outcomes of match alerts, Rite Aid employees

recorded thousands of false positive match alerts between December 2019 and July 2020.  Other

evidence of false-positive matches includes:

    a.    In numerous instances, Rite Aid's facial recognition technology generated

match alerts that were likely false positives because they occurred in

stores that were geographically distant from the store that created the

relevant enrollment.  For example, between December 2019 and July

2020, Rite Aid's facial recognition technology generated over 5,000 match

alerts in stores that were more than 100 miles from the store that created

the relevant enrollment.  In fact, Rite Aid employees expressed frustration

8

about the rate of false-positive match alerts that were generated for

enrollments from geographically distant stores.

b.   Some enrollments generated high numbers of match alerts in locations

throughout the United States.  For instance, during a five-day period, Rite

Aid's facial recognition technology generated over 900 match alerts for a

single enrollment.  The match alerts occurred in over 130 different Rite

Aid stores (a majority of all locations using facial recognition technology),

including hundreds of alerts each in New York and Los Angeles, over 100

alerts in Philadelphia, and additional alerts in Baltimore; Detroit;

Sacramento; Delaware; Seattle; Manchester, New Hampshire; and

Norfolk, Virginia.  In multiple instances, Rite Aid employees took action,

including asking consumers to leave stores, based on matches to this

enrollment.

c.   Between December 2019 and July 2020, Rite Aid's facial recognition

technology generated over 2,000 match alerts that occurred within a short

time of one or more other match alerts to the same enrollment in

geographically distant locations within a short period of time, such that it

was impossible or implausible that the same individual could have caused

the alerts in the different locations.  For example, for a particular

enrollment image that was originally captured at a Los Angeles store, Rite

Aid's facial recognition technology generated over 30 match alerts in New

York City and Philadelphia between February 2020 and July 2020.  Each

of the New York and Philadelphia matches occurred within 24 hours of a

match alert in a California store and thus was likely a false positive.

### RITE AID'S FACIAL RECOGNITION TECHOLOGY PRACTICES

32.    In connection with deploying facial recognition technology in a subset of its retail

pharmacy locations, Rite Aid has failed to take reasonable measures to prevent harm to

consumers.  Among other things, Rite Aid has:

a.    Failed to assess, consider, or take reasonable steps to mitigate risks to

consumers associated with its implementation of facial recognition

technology, including risks associated with misidentification of consumers

at higher rates depending on their race or gender;

b.    Failed to take reasonable steps to test, assess, measure, document, or

inquire about the accuracy of its facial recognition technology before

deploying the technology;

c.    Failed to take reasonable steps to prevent the use of low-quality images in

connection with its facial recognition technology, increasing the likelihood

of false-positive match alerts;

d.    Failed to take reasonable steps to train or oversee employees tasked with

operating facial recognition technology and interpreting and acting on

match alerts; and

e.    Failed to take reasonable steps, after deploying the technology, to

regularly monitor or test the accuracy of the technology, including by

failing to implement any procedure for tracking the rate of false positive

facial recognition matches or actions taken on the basis of false positive

facial recognition matches.

33.    In significant part as a result of Rite Aid's conduct, as discussed above, Rite Aid's

facial recognition technology has generated numerous false positive facial recognition match

alerts.

34.    As a result of these false-positive match alerts, Rite Aid subjected consumers to

surveillance, removal from stores, and emotional and reputational harm, as well as other harms.

### Failure to Consider and Address Risks to Consumers, Including Increased Risks Based on Race or Gender

35.    Rite Aid failed to consider, assess, or take into account the likelihood of false-

positive matches or the potential risks false-positive matches posed to consumers.

36.    An internal presentation advocating expansion of Rite Aid's facial recognition

program following Rite Aid's pilot deployment of facial recognition technology identified only a

single risk associated with the program: "[m]edia attention and customer acceptance."

37.    Rite Aid failed to assess or address any other risks to consumers, including risks

that false-positive match alerts could lead to a restriction of consumers' ability to make needed

purchases, severe emotional distress, reputational harm, or even wrongful arrest.

38.    These risks were reasonably foreseeable by Rite Aid.  For example, Rite Aid

knew that it had instructed employees to take actions up to and including calling the police based

on match alerts.  Rite Aid also quickly became aware that its facial recognition technology

generated false-positive match alerts.

39.    Rite Aid also failed to take steps to assess or address risks that its deployment of

facial recognition technology would disproportionately harm consumers because of their race,

gender, or other demographic characteristics.

11

40.     For example, Rite Aid failed to consider whether its policies related to the selection of certain stores to use facial recognition technology, including prioritizing what it called "urban" areas and stores along public transportation routes, would disproportionately impact certain populations, including racial or ethnic minority populations.

41.     In fact, although approximately 80 percent of Rite Aid stores are located in plurality-White (i.e., where White people are the single largest group by race or ethnicity) areas, about 60 percent of Rite Aid stores that used facial recognition technology were located in plurality non-White areas.  As a result, store patrons in plurality-Black, plurality-Asian, and plurality-Latino areas were more likely to be subjected to and surveilled by Rite Aid's facial recognition technology.

42.     The accuracies of facial recognition technologies often vary depending on the demographics, including the race and gender, of image subjects.  In particular, many currently available facial recognition technologies produce more false-positive matches for Black or Asian image subjects compared to White image subjects.  Likewise, many facial recognition technologies have higher error rates for women image subjects than for men.

43.     However, Rite Aid made no effort, either before implementing facial recognition technology or at any time while using the technology, to assess, test, inquire, or monitor whether the accuracy of its facial recognition technology varied depending on characteristics of the image subject, including whether the technology was especially likely to generate false positives depending on image subjects' race or gender.

44.     In fact, match alerts occurring in stores located in areas where the plurality of the population was Black or Asian were significantly more likely to have low confidence scores than match alerts occurring in stores located in plurality-White areas.

12

45.     Similarly, match alerts to enrollments with typically feminine names (i.e., where the enrolled person was likely a woman) were significantly more likely to have low confidence scores than match alerts to enrollments with typically masculine names.

46.     Match alerts with low confidence scores were more likely to be false positives than match alerts with high confidence scores.

47.     Nonetheless, Rite Aid did not modify its policies in light of these low-confidence-score match alerts.

48.     Moreover, Rite Aid failed to modify its policies to address increased risks to consumers based on race and gender even after its facial recognition technology generated egregious results.  For example, Rite Aid conducted an internal investigation into an incident in which Rite Aid's facial recognition technology generated an alert indicating that a consumer—specifically a Black woman—was a match for an enrollment image that Rite Aid employees described as depicting "a white lady with blonde hair."  In response to the alert, Rite Aid employees called the police and asked the woman to leave the store before realizing the alert was a false positive.

49.     As a result of Rite Aid's failures, Black, Asian, Latino, and women consumers were especially likely to be harmed by Rite Aid's use of facial recognition technology.

**Failure to Test or Assess Accuracy Before Deployment**

50.     Rite Aid failed to test or assess the technology's accuracy before deploying facial recognition technology from its two vendors.

51.     Rite Aid did not ask its first vendor for any information about the extent to which the technology had been tested for accuracy and did not obtain, review, or rely on the results of

any such testing.  In fact, in its contract with Rite Aid, the vendor expressly disclaimed the

accuracy of the technology it provided, stating:

> [VENDOR] MAKES NO REPRESENTATIONS OR WARRANTIES AS TO
> THE ACCURACY AND RELIABILITY OF THE PRODUCT IN THE
> PERFORMANCE OF ITS FACIAL RECOGNITION CAPABILITIES.
> [VENDOR] DISCLAIMS ANY RESPONSIBILITY OR WARRANTY,
> EXPRESS OR IMPLIED, WITH RESPECT TO ANY FALSE
> IDENTIFICATION OR MISIDENTIFICATION ARISING FROM THE USE OF
> THE PRODUCT.

52.     Additionally, at least some match alerts generated by the vendor's technology

included a disclaimer stating, in part:

> YOU AGREE THAT THIS INFORMATION IS PROVIDED ON AN 'AS IS'
> BASIS WITHOUT WARRANTY OF ANY KIND…. THE ENTIRE RISK AS
> TO THE QUALITY AND PERFORMANCE OF THE INFORMATION IS
> WITH YOU. SHOULD ANY INFORMATION PROVE INCORRECT IN ANY
> RESPECT, YOU ASSUME THE COST OF ANY CORRECTION.

53.     In addition to its failure to test or assess accuracy when contracting with its first

vendor, Rite Aid also failed to test for accuracy during its pilot deployment of the facial

recognition technology.  Rite Aid's initial implementation of the vendor's technology included a

pilot in a small number of stores before expanding to more stores, but Rite Aid did not assess the

rate at which the technology generated false-positive match alerts during the pilot.

54.     After Rite Aid fully deployed the first vendor's facial recognition technology, it

was aware or should have been aware that the technology generated numerous false-positive

match alerts.

55.     Nevertheless, when switching to the second vendor's facial recognition

technology, Rite Aid once again did not seek, and did not receive, any test results or other

information about, assurances of, or evidence of accuracy, including the likelihood of false-positive matches, prior to piloting and fully implementing the technology.

56.     Like the first vendor, Rite Aid's second vendor also disclaimed the accuracy of match alerts generated by its technology.  Match alerts generated by the vendor's technology included a disclaimer of the match alerts' accuracy, which stated that it had "identified a PROBABLE match.  Feature matching technology cannot guarantee 100% matches.  Discretion is advised."

**Failure to Enforce Image Quality Controls**

57.     Rite Aid regularly used low-quality enrollment images in connection with its facial recognition technology, increasing the likelihood of false-positive match alerts.

58.     Rite Aid knew that using high quality images was important for the accuracy of its facial recognition technology.  For instance, Rite Aid employees noted in an internal presentation about its facial recognition technology that "[h]igh quality digital photos of enrollees enhance[d] [the] number of hits."  And Rite Aid's first vendor told Rite Aid that "The quality of the photos used for [facial recognition technology] is extremely important…. Without good quality photos, an enrollment is not useful."

59.     With this knowledge, Rite Aid established image quality policies that included requirements that enrollment images:

      a.     Should "have equal lighting on the entire face, no hotspots or shading;"

      b.     Should be aligned so that one could "see both ears equally in the photo" and "the person's eyes should be aligned with the top of their ears;" and

      c.     Should depict subjects with glasses removed and with neutral facial expressions.

15

60.     However, Rite Aid often used images that fell short of Rite Aid's own image quality standards contributing to the rate of false-positive match alerts.  In fact, Rite Aid's methods for capturing images—for example, its use of cameras that frequently produced "blurry" images—increased the likelihood that its enrollment images would not meet its own image quality standards.

61.     Contrary to its policy, Rite Aid also regularly enrolled images with poor lighting, which further increased the likelihood of false-positive match alerts.  Such lighting issues included overexposure, glare, and low natural light.

62.     For instance, a Rite Aid employee told Rite Aid's facial recognition vendor that "[t]he majority of images captured by [Rite Aid's facial recognition] cameras" and enrolled in the database were of inadequate quality, citing the fact that Rite Aid's cameras did not adjust to changes in daylight, and that many instances of criminal activity—i.e., instances in which Rite Aid sought to capture enrollment images—occurred at night, "when [the cameras'] images are the poorest."

63.     Additionally, Rite Aid violated its own policy by regularly enrolling images in which the subject was not looking at or directly facing the camera, the subject's face was obscured, the subject was wearing accessories such as a hat or glasses, or the subject did not have a neutral expression.

64.     Enrollment images with these characteristics were likely to generate false-positive match alerts.

65.     Rite Aid also understood that a single poor-quality enrollment image could—and in multiple instances did—cause numerous false-positive matches.  For example, in one instance, a Rite Aid executive told Rite Aid's facial recognition technology vendor that a particular

16

enrollment uploaded earlier the same day had caused "dozens of false alerts."  The enrollment

was accompanied by an instruction to contact the police.

### Failure to Train and Oversee Employees

66.    Rite Aid's failure to appropriately train or oversee employees who operated facial

recognition technology further increased the likelihood of harm to consumers.

67.    Although it was Rite Aid's policy that its retail stores provide employees

authorized to operate facial recognition technology with approximately one to two hours of

training on its facial recognition system, in nearly all cases Rite Aid did not verify or obtain any

record that employees had received the required training.

68.    Moreover, Rite Aid's training materials were very limited and did not address the

risks to consumers from using the technology.  In numerous instances, the training materials Rite

Aid prepared to train store-level employees who operated Rite Aid's facial recognition

technology were limited to topics such as how to navigate the websites and mobile applications

used to interact with the technology, and how to enter new enrollments.  Rite Aid's training

materials either did not address the possibility that the technology would generate false-positive

match alerts or contained only a cursory reference to such a possibility.

69.    Rite Aid never provided any training to any employees, for example, about the

limitations of facial recognition technology, how to evaluate the quality of live images to

determine their value for comparison, how to compare facial images to determine whether they

are a match, or the effects of various types of bias on the accuracy of facial comparisons by

humans.

70.    Rite Aid knew that store employees who operated its facial recognition

technology frequently failed to comply with company policies related to the use of facial

recognition technology, including, as discussed above, image quality standards and procedures related to alert resolution. Among other things, data maintained by Rite Aid and its vendor showed that its employees failed to adhere to company policy, including because many enrollment images did not meet quality standards.

71.    Through consumer complaints and other means, Rite Aid was also aware that in some instances employees who were not authorized to operate Rite Aid's facial recognition technology and therefore did not receive training on how to use the technology, evaluate matches, or approach consumers, nevertheless used the technology.

72.    Rite Aid employees frequently recorded that they took more aggressive action in response to match alerts than the alerts instructed. In fact, between December 2019 and July 2020, in response to alerts with an instruction to "observe or provide customer service," Rite Aid employees more frequently recorded that they had asked a consumer to leave the store than that they had "observed" the consumer as instructed.

73.    Despite employees' documented and frequent non-compliance with facial recognition policies and procedures, Rite Aid did not take any measures to improve its training and oversight of employees who operated the facial recognition technology.

**Failure to Monitor, Assess, or Test Accuracy of Results**

74.    Rite Aid failed to regularly monitor and assess the accuracy of the results of its facial recognition technology. This failure persisted despite Rite Aid's general awareness that the technology generated numerous false-positive matches. Among other things, Rite Aid failed to adequately (i) verify or test the accuracy of match alerts, (ii) record outcomes or track the rate of false-positive matches, and (iii) remedy problematic enrollments.

75.     In part because of Rite Aid's failures to track, monitor, assess, or test its facial

recognition technology, Rite Aid did not have a reasonable basis to believe that any given match

alert was likely to be accurate.  Nevertheless, Rite Aid continued to instruct store-level

employees to take action against consumers on the basis of facial recognition match alerts.

### *Failure to Verify or Test Accuracy of Match Alerts*

76.     Rite Aid did not conduct, or require its vendors to conduct, any regular or ongoing

testing demonstrating the accuracy of match alerts.

77.     Rite Aid did not require employees to verify the accuracy of matches by, e.g.,

checking individuals' identification before requiring them to leave the store.  Although Rite Aid

instructed employees to "identify" the subject of a match alert by calling out the name registered

in the enrollment database before asking a consumer to leave a store, in numerous instances Rite

Aid employees did not and could not have followed this procedure.  As of July 2020, a majority

of enrollments in Rite Aid's database did not include a first or last name for the enrolled

individual, making it impossible to "identify" alert subjects using their names.  Rite Aid

employees recorded thousands of instances in which they asked consumers to leave stores based

on match alerts to enrollments with no recorded name.

78.     Because Rite Aid did not have a procedure to verify the accuracy of facial

recognition matches, its only basis for assessing the accuracy of any given match was the

impression of store-level employees who, as discussed above, had not received any training in

how to make such an assessment.  These deficiencies in Rite Aid's procedures contributed to its

failure to identify and address issues with match alerts.

*Failure to Record Outcomes or Track False Positives*

79.    Rite Aid failed to record outcomes of alerts or track false positives in order to

assess the accuracy of its facial recognition technology.

80.    The facial recognition technology that Rite Aid initially deployed did not include

a mechanism to track outcomes and Rite Aid did not establish a procedure to track outcomes.

81.    Rite Aid later switched to a technology that included a mechanism to record the

outcome of an alert.  The mechanism allowed employees to input information about an alert,

such as that the alert was a "Bad Match" or that they had approached a consumer and asked the

consumer to leave.  This process was referred to as "resolving" a match.

82.     Although Rite Aid's policy required employees to "resolve" every match alert,

Rite Aid did not enforce this policy.  For example, between December 2019 and July 2020, Rite

Aid employees failed to "resolve" approximately two thirds of all match alerts.

83.    As a result of its lax policy enforcement, Rite Aid had no way to track false

positives and therefore no way to assess the accuracy of the facial recognition technology as

deployed.

*Failure to Remedy Problematic Enrollments*

84.    Rite Aid retained active enrollments in its database even after they generated

numerous false-positive matches.  For example:

    a.    **Bronx Example**—Employees at a Rite Aid retail pharmacy located in The

        Bronx in New York uploaded an enrollment image to Rite Aid's database

        on May 16, 2020.  Between May 16, 2020, and July 2020, Rite Aid's

        facial recognition technology generated over 1,000 match alerts for the

        enrollment—nearly 5 percent of all match alerts generated by Rite Aid's

20

facial recognition technology during this time period.  Many of these match alerts were likely false positives, including because:

    i.    Over 99 percent of all match alerts for the enrollment were generated in Rite Aid locations in or near Los Angeles, California, on the other side of the country from the site of enrollment;

    ii.    In at least four instances, match alerts for the enrollment were generated in both New York and California within a 24-hour period; and

    iii.    Although Rite Aid employees only recorded outcomes for less than 3 percent of match alerts to the enrollment—all of them were labeled "Bad Matches."

    b.    **<u>Seattle Example</u>**—Employees at a Rite Aid store near Seattle uploaded an enrollment image in November 2019.  Between December 2019 and July 2020, Rite Aid's facial recognition technology generated hundreds of match alerts for the enrollment.  Many match alerts to the enrollment were likely false positives, including because:

    i.    Fewer than 10 percent of all match alerts for the enrollment occurred in or near Seattle, where the store that created the enrollment was located;

    ii.    By contrast, over half of the match alerts were generated in stores located in or near New York City and a further one quarter of alerts were generated in the Los Angeles area, with dozens of additional alerts generated in Sacramento and Philadelphia; and

iii.   Rite Aid employees did not record any outcome for most of the
match alerts, but over three quarters of the time when employees
did record an outcome, they labeled the alerts as "Bad Matches."
In multiple instances—mostly in New York—employees recorded
that they had carried out the instruction assigned to the enrollment,
resulting in heightened employee surveillance of patrons whose
live images triggered these likely false positive alerts.

c.   **<u>Virginia Example</u>**—Employees in a Rite Aid location in Norfolk,
Virginia created an enrollment in November 2019.  Rite Aid's facial
recognition technology generated hundreds of match alerts for this
enrollment between December 2019 and July 2020, many of which were
likely false positives.  Among other things:

i.   The match alerts mostly occurred in or near Detroit, New York
City, and Philadelphia, with additional instances occurring in the
Sacramento, Seattle, Baltimore, and Los Angeles areas—
sometimes within a short period of time.  For example, within
approximately 24 hours, match alerts to the enrollment occurred in
Los Angeles, in Detroit, and in Mount Vernon, New York; and

ii.   Although Rite Aid's employees most often did not record the
outcome of the match alerts, Rite Aid employees did report over
100 instances of "Bad Matches" to the enrollment.  In multiple
other instances, Rite Aid employees either subjected consumers to
heightened surveillance or took even more aggressive action than

22

the match alerts instructed by barring individuals from Rite Aid

stores on the basis of likely false-positive matches to this

enrollment.

## RITE AID'S FACIAL RECOGNITION TECHNOLOGY PRACTICES CAUSED OR WERE LIKELY TO CAUSE SUBSTANTIAL CONSUMER INJURY

85.    Rite Aid's facial recognition technology practices caused or were likely to cause

substantial consumer injury by increasing the risk of false-positive match alerts.

86.    As described above, Rite Aid's use of facial recognition technology was

especially likely to result in false-positive matches for Black, Latino, Asian, and women

consumers.

87.    In numerous instances, Rite Aid's employees acted on match alerts that were false

positives.  As a result, numerous consumers were mistakenly identified as shoplifters or

wrongdoers.

88.    Rite Aid's actions in relying on facial recognition technology without addressing

these risks caused or were likely to cause injury to consumers, including because Rite Aid

employees:

a.    surveilled and followed consumers around the store;

b.    instructed consumers to leave Rite Aid stores and prevented them from

making needed or desired purchases, including prescribed and over-the-

counter medications and other health aids;

c.    subjected consumers to unwarranted searches;

d.    publicly and wrongly accused consumers of shoplifting, including,

according to consumer complaints, in front of the consumers' coworkers,

employers, children, and others; or

23

e.    called the police to confront or remove the consumer.

89.    Therefore, taking action based on a false-positive match alert potentially exposed consumers to risks including the restriction of consumers' ability to make needed purchases, severe emotional distress, reputational harm, or even wrongful arrest.

90.    Consumers complained to Rite Aid that they had experienced humiliation and feelings of stigmatization as a result of being confronted by Rite Aid's employees based on false-positive facial recognition matches.

91.    Moreover, some of the consumers enrolled in Rite Aid's database or approached by Rite Aid's employees as a result of facial recognition match alerts were children.  For example, Rite Aid employees stopped and searched an 11-year-old girl on the basis of a false-positive facial recognition match.  The girl's mother told Rite Aid that she had missed work because her daughter was so distraught by the incident.

92.    Multiple consumers told Rite Aid that they believed the false-positive facial recognition stops were a result of racial profiling.  One consumer wrote to Rite Aid: "I feel different from this experience when I walk into a store now it's weird.  Before any of your associates approach someone in this manner they should be absolutely sure because the effect that it can [have] on a person could be emotionally damaging…. [E]very black man is not [a] thief nor should they be made to feel like one."

93.    The harms outlined above are not outweighed by countervailing benefits to consumers or competition.

## THE COMMISSION ORDER

94.    In the Commission's 2010 Administrative Complaint, bearing Docket No. C-4308, (the "Administrative Complaint"), the Commission charged Rite Aid Corporation with

engaging in deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §

45(a), for its failure to employ reasonable and appropriate measures to prevent unauthorized

access to personal information.  *See* Ex. B, *In the Matter of Rite Aid Corporation*, C-4308, 150

F.T.C. 694 (Nov. 12, 2010) (Administrative Complaint) at ¶¶ 6-12.

95.     The Administrative Complaint asserted Rite Aid Corporation misrepresented that

it implemented reasonable and appropriate measures to protect personal information against

unauthorized access because it (1) did not implement reasonable and appropriate measures to

protect personal information against unauthorized access and (2) failed to employ reasonable and

appropriate measures to prevent unauthorized access to personal information.  *Id.* at ¶¶ 9-11.

96.     Rite Aid Corporation settled the Commission's Administrative Complaint with

the Commission Order.  The Commission Order became final in November 2010 and remains in

effect.

97.     Pursuant to Section II of the Commission Order, Rite Aid must "establish,

implement, and maintain a comprehensive information security program that is reasonably

designed to protect the security, confidentiality, and integrity of [P]ersonal [I]nformation

collected from or about consumers."  The information security program must include the

"development and use of reasonable steps to select and retain service providers capable of

appropriately safeguarding personal information they receive from [Rite Aid], and requiring

service providers by contract to implement and maintain appropriate safeguards."  *See* Ex. A,

Commission Order, § II.

98.     Rite Aid must "fully document the content and implementation of this

information security program in writing."  *See* Ex. A, Commission Order, § II.

25

99.     The Commission Order defines "personal information" to include various forms of personally identifiable information, including personal health information and sensitive personally identifiable information.  *See* Ex. A, Commission Order, Definition 4 ("Personal Information" throughout this Complaint).

100.     Section III of the Commission Order requires Rite Aid to "obtain initial and biennial assessments and reports ('Assessments') from a qualified, objective, independent third-party professional, who uses procedures and standards generally accepted in the profession." The Assessments must determine whether Rite Aid's information security program is operating with sufficient effectiveness to provide reasonable assurance that the security, confidentiality, and integrity of personal information is protected and has so operated throughout the relevant reporting period.  *See* Ex. A, Commission Order, § III.

101.     Section IV of the Commission Order provides:

> **IT IS FURTHER ORDERED** that [Rite Aid] shall maintain and, upon request, make available to the Federal Trade Commission for inspection and copying . . .  for a period of five (5) years, a print or electronic copy of each document relating to compliance, including, but not limited to, documents, prepared by or on behalf of [Rite Aid], that contradict, qualify, or call into question [Rite Aid's] compliance with this order.

*See* Ex. A, Commission Order, § IV (emphasis in original).

## RITE AID'S NOTICE OF THE COMMISSION ORDER

102.     Rite Aid Corporation consented to, was served with, and has notice of the Commission Order.  Rite Aid Hdqtrs. Corp. is a wholly owned subsidiary of Rite Aid Corporation, is accordingly bound by the Commission Order, and had notice of it.  *See* Ex. A, Commission Order, Definition 3 (defining "Respondent").

## RITE AID'S INFORMATION SECURITY POLICIES AND ITS FAILURES TO COMPLY WITH THESE POLICIES AND THE COMMISSION ORDER

### Rite Aid's Information Security Policies

103.    Since at least November 2016, Rite Aid has instituted policies designed to select and retain service providers capable of appropriately safeguarding Personal Information they receive from Rite Aid and requiring service providers by contract to implement and maintain appropriate safeguards.

104.    Rite Aid's November 2016 "Information Security Program" outlines the process Rite Aid instituted to assess whether vendors were capable of appropriately safeguarding Personal Information received from Rite Aid (the "2016 Policy").

105.    Specifically, the 2016 Policy required Rite Aid, whenever it engaged a new vendor on a project, to provide that vendor with its vendor technology guidelines.  Additionally, the 2016 Policy required Rite Aid to provide the vendor with a base set of questions so Rite Aid could assess the security and technology environment surrounding the new vendor's technology.

106.    These risk-based questions required the vendor to provide:  (1) a summary of the proposed technology; (2) a copy of any security assessments performed on the environment; (3) an explanation of the vendor's control environment; and (4) a signed non-disclosure agreement or business associate agreement, when applicable.

107.    The 2016 Policy also required the vendor to provide Rite Aid with responses to these questions.  Once received, the 2016 Policy required its Chief Information Security Officer ("CISO") to evaluate the vendor's technology.

108.    After Rite Aid approved a vendor, the 2016 Policy required Rite Aid's Vice President and CISO to review the vendor contract.  The 2016 Policy also required all new vendor contracts to contain language relevant to information security, including:  (1) appropriate control

of sensitive data (including at or after termination of an agreement); (2) control over access to

vendor/Rite Aid systems; (3) control over potential virus introduction to Rite Aid systems; (4)

adherence to industry "best practices" for security within the proposed environment; (5) security

breach standards and processes; (6) requirements for providing Rite Aid with annual security

and operations assessments on an ongoing basis; and (7) encryption credit card processing, if

applicable.

109.    Rite Aid's May 2019 contract review and approval policy also required Rite Aid's

information security division to approve all contracts where (a) the vendor will use, access or

connect to Rite Aid systems or data; (b) the vendor will place equipment or software on Rite

Aid's premises or network; (c) the vendor will provide technology services; (d) the vendor will

receive or send data; (e) personal health information, personally identifiable information, or

credit card data will be shared; (f) Rite Aid associates or customers will access a website/portal

or mobile app; and/or (g) contractors or temporary employees will be working in information

security.

110.    Once a vendor signed and completed the contract, the 2016 Policy required Rite

Aid to maintain a tracking database of all contracts and vendors reviewed.  The 2016 Policy also

required Rite Aid to obtain and review updated security assessments on a periodic basis to

determine whether the vendor continues to maintain a secure technology environment and an up-

to-date Information Security Program.  Additionally, the 2016 Policy required Rite Aid to

maintain all risk documents for contracts that the CISO reviews for each subsidiary.

111.    Rite Aid revised the 2016 Policy in February 2018, March 2019, September 2019,

and August 2020.  Each of these information security policies contained substantially the same

policies for assessing whether vendors were capable of appropriately safeguarding Personal Information received from Rite Aid as the 2016 Policy required.

112.    In July 2022, Rite Aid began using an electronic tool to help manage the process for assessing vendors that access Personal Information.  Prior to that date, Rite Aid maintained significant amounts of information in hard copy files.

113.    In January 2023, Rite Aid launched a new contracting process pursuant to which its legal department (1) both reviews the vendor intake form and manages the contract through negotiation and signing, and (2) can require a security assessment if it determines one is necessary but was not originally undertaken.

### Rite Aid's Information Security Practices

114.    Since January 1, 2017, Rite Aid has provided Personal Information to over 420 third-party service providers.

115.    On numerous of those occasions, Rite Aid failed to:  (1) conduct a comprehensive security assessment of service providers that would meet the standards set forth in its own policies; (2) document the implementation of its information security program; (3) use reasonable steps to retain service providers that would meet the standards set forth in its own policies; or (4) require service providers by contract to implement and maintain appropriate safeguards for Personal Information they received from Rite Aid, as set forth in its own policies.

***Rite Aid Failed to Use Reasonable Steps to Select Service Providers Capable of Appropriately Safeguarding Personal Information They Received from Rite Aid and Document the Implementation of This Process.***

116.    On numerous occasions since January 1, 2017, Rite Aid has conducted security assessments of service providers on phone calls and in meetings, rather than requiring these vendors to provide written responses to survey questions.

117.    On numerous of these occasions, Rite Aid did not obtain backup documentation for the service providers it assessed through oral rather than written means, including service providers Rite Aid deemed to be "high risk" and service providers for which Rite Aid deemed ongoing assessments to be necessary, in violation of Rite Aid's own policies.

118.    During phone calls and on other occasions, Rite Aid's practice was to use a form it called "Rite Aid Ongoing Vendor Risk Assessment" to capture information (the "Assessment Form").  An example of the Assessment Form is depicted below and attached as **Exhibit C**:



119.    On numerous occasions after having these phone calls and meetings, Rite Aid did not use the Assessment Form to document information about potential service providers' ability to appropriately safeguard Personal Information they would receive from Rite Aid.  Indeed, on numerous occasions, Rite Aid did not document responses to the majority of the eight standard questions on the Assessment Form at all.  Such questions included whether Rite Aid sent the

30

service provider a security questionnaire; whether the service provider returned that

questionnaire; the level of risk Rite Aid deemed that service provider to pose to Rite Aid's

systems; whether Rite Aid received a security assessment from the vendor; and whether Rite Aid

deemed it necessary to conduct ongoing assessments of that vendor.

120.    On numerous occasions between November 29, 2019 and November 28, 2021,

Rite Aid did not maintain risk assessment documentation for vendors, in violation of its own

policies.

121.    Pursuant to Section III of the Order, Rite Aid received an Assessment from

Protiviti Inc. ("Protiviti"), an independent third-party assessor, alerting it to the problem

specified in Paragraph 120 no later than January 27, 2022.

### *Rite Aid Failed to Periodically Reassess Service Providers.*

122.    On numerous occasions between November 29, 2017, and November 28, 2021,

Rite Aid did not consistently reassess vendors' information security programs on a periodic

basis, in violation of its own policies.

123.    Pursuant to Section III of the Order, Rite Aid received an Assessment from

PricewaterhouseCoopers LLP, an independent third-party assessor, alerting it to the problem

specified in Paragraph 122 by no later than January 28, 2020.  Rite Aid also received an

Assessment from Protiviti alerting it to this problem no later than January 27, 2022.

124.    Between November 29, 2019, and November 28, 2021, Rite Aid did not

consistently use the contract renewal process to include cybersecurity policy provisions in

vendor contracts and inform vendors of Rite Aid's information security requirements, in

violation of Rite Aid's own policies.

125.    On at least one occasion between November 29, 2019 and November 28, 2021, Rite Aid did not cause a third-party risk assessment to be performed for a large pharmaceutical company with which it contracted and which had a third-party data breach in 2021.

126.    Rite Aid received an Assessment from Protiviti alerting it to the problems specified in Paragraphs 124 - 125 no later than January 27, 2022.

### Rite Aid Failed to Require Service Providers by Contract to Implement and Maintain Appropriate Safeguards for Personal Information They Received from Rite Aid.

127.    Between November 29, 2019, and November 28, 2021, numerous Rite Aid contracts with service providers who obtained Personal Information from Rite Aid lacked or only had minimal information security requirements as a part of the contract, in violation of Rite Aid's own policies.

128.    Between November 29, 2019, and November 28, 2021, numerous Rite Aid contracts with service providers who obtained Personal Information from Rite Aid did not include language regarding Rite Aid's breach notification requirements, in violation of Rite Aid's own policies.

129.    Between November 29, 2019, and November 28, 2021, numerous Rite Aid contracts with service providers who obtained Personal Information from Rite Aid did not include language regarding the return of confidential data, in violation of Rite Aid's own policies.

130.    Rite Aid received an Assessment from Protiviti alerting it to the problems specified in Paragraphs 127 - 129 no later than January 27, 2022.

**Rite Aid's Deficient Productions to the FTC**

131.    On December 13, 2022, the FTC demanded that Rite Aid produce a copy of each document sufficient to show the steps Rite Aid took to ensure that each of these service providers was capable of appropriately safeguarding Personal Information it received from Rite Aid.

132.    On December 13, 2022, the FTC also demanded that Rite Aid produce a copy of each contract with a service provider requiring it to implement and maintain appropriate safeguards.

133.    For numerous service providers to which it provided Personal Information, Rite Aid did not maintain records demonstrating it took any steps to determine whether these service providers were capable of appropriately safeguarding Personal Information.

134.    For numerous service providers to which it provided Personal Information, Rite Aid did not produce to the FTC records demonstrating it took any steps to ensure these service providers were capable of appropriately safeguarding Personal Information.

135.    For numerous service providers to which it provided Personal Information, Rite Aid did not maintain records demonstrating that it required, by contract, these service providers to implement and maintain appropriate safeguards to protect Personal Information.

136.    For numerous service providers to which it provided Personal Information, Rite Aid did not produce to the FTC records demonstrating that it required, by contract, these service providers to implement and maintain appropriate safeguards to protect Personal Information.

**RITE AID'S VIOLATIONS OF THE 2010 ORDER ARE LIKELY TO CAUSE
SUBSTANTIAL CONSUMER INJURY**

137.    By failing to implement or maintain a comprehensive information security program in violation of the 2010 Order, Rite Aid is likely to cause substantial consumer injury.

138.    The harms outlined in Paragraph 137 above are not outweighed by countervailing

benefits to consumers or competition.

### THE DEFENDANTS' ILLEGAL CONDUCT TOOK PLACE OVER A DECADE

139.    Based on the facts and violations of law alleged in this Complaint, the FTC has

reason to believe that Defendants are violating or are about to violate laws enforced by the

Commission because, among other things:

a.    Defendants engaged in their unlawful facial recognition acts and practices

continually over a period of at least seven years, and have violated the

Commission Order since at least 2017;

b.    Defendants continued their unlawful acts or practices despite knowledge

of longstanding problems with false-positive facial recognition matches

and despite receiving consumer complaints describing harms that

consumers experienced in connection with false-positive facial recognition

matches;

c.    Defendants stopped their unlawful conduct only after they learned that

press coverage of their facial recognition practices would be published

imminently;

d.    Defendants remain in the business of operating retail pharmacies and

maintain the means, ability, and incentive to resume their unlawful

conduct; and

e.    Rite Aid continues to violate the Commission Order because it has not

produced hundreds of contracts with, or security assessments for, vendors

in violation of Sections II and IV of the Commission Order.

34

## Count I: Unfair Facial Recognition Technology Practices

140.    In numerous instances, as described in Paragraphs 2-93, Defendants have used facial recognition technology in their retail stores without taking reasonable steps to address the risks that their deployment of such technology was likely to result in harm to consumers as a result of false-positive facial recognition match alerts.

141.    Defendants' actions cause or have been likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

142.    Therefore, Defendants' acts or practices as set forth in Paragraph 140 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a), (n).

## Count II:  Unfair Failure to Implement or Maintain a Comprehensive Information Security Program in Violation of Section II of the 2010 Order

143.    Paragraphs 1 through 17 and 94 through 139 are incorporated as if set forth herein.

144.    Section II of the Commission Order requires Rite Aid to "establish and implement, and thereafter maintain, a comprehensive information security program that is reasonably designed to protect the security, confidentiality, and integrity of [P]ersonal [I]nformation collected from or about consumers."  To do so under Section II of the Commission Order, Rite Aid must:

> A.  "Develop[] and use . . . reasonable steps to select and retain service providers capable of appropriately safeguarding [P]ersonal [I]nformation they receive from [Rite Aid]";

B. "Requir[e] service providers by contract to implement and maintain
appropriate safeguards" to protect Personal Information they receive from
Rite Aid; and

C. "Fully document[] in writing" the "content and implementation of" the
information security program.

145.    In truth and in fact, in numerous instances, Rite Aid did not implement or
maintain a comprehensive information security program.  Rite Aid:

A. Did not use reasonable steps to select and retain service providers capable of
appropriately safeguarding Personal Information they received from Rite Aid,
including by failing to follow its own information security policies.

B. Did not require service providers to which it provided Personal Information
to, by contract, implement or maintain appropriate safeguards.

C. Failed to fully document in writing the content and implementation of its
information security program.

146.    Therefore, in numerous instances, as described in Paragraphs 143-145,
Defendants failed to implement or maintain a comprehensive information security program in
violation of Section II of the 2010 Order.

147.    Defendants' actions cause or have been likely to cause substantial injury to
consumers that consumers cannot reasonably avoid themselves and that is not outweighed by
countervailing benefits to consumers or competition.

148.    Therefore, Defendants' acts or practices as set forth in Paragraphs 143-147
constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a),
(n).

## CONSUMER INJURY

149.    Consumers have suffered and will continue to suffer substantial injury as a result

of Defendants' violations of the FTC Act and the 2010 Order.  Absent injunctive relief by this

Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

WHEREFORE, the FTC requests that the Court:

A.    Enter a permanent injunction to prevent future violations by Rite Aid of

the FTC Act or the 2010 Order, or as the 2010 Order is subsequently

modified by operation of law; and

B.    Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:   December 19, 2023                /s/ Robin L. Wetherill
                                          Robin L. Wetherill, CA Bar No. 323912
                                          Leah Frazier, DC Bar No. 492540
                                          N. Diana Chang, CA Bar No. 287624
                                          Christopher J. Erickson, MD Bar No. 1712130163
                                          Brian M. Welke, DC Bar No. 1017026
                                          Federal Trade Commission
                                          600 Pennsylvania Avenue, N.W.
                                          Washington, D.C. 20580
                                          Phone: (202) 326-2220 (Wetherill); -2187 (Frazier)
                                          -3671 (Erickson); -2897 (Welke);
                                          (415) 848-5192 (Chang)
                                          Fax: (202) 326-3062
                                          rwetherill@ftc.gov
                                          lfrazier@ftc.gov
                                          nchang@ftc.gov
                                          cerickson@ftc.gov
                                          bwelke@ftc.gov

                                          Attorneys for Plaintiff
                                          FEDERAL TRADE COMMISSION

# Exhibit A

*In the Matter of Rite Aid Corporation*, C-4308, 2010 Decision and Order

072-3121

# UNITED STATES OF AMERICA
# FEDERAL TRADE COMMISSION

**COMMISSIONERS:**     **Jon Leibowitz, Chairman**
**William E. Kovacic**
**J. Thomas Rosch**
**Edith Ramirez**
**Julie Brill**

_____
                                   )
**In the Matter of**                )          **DOCKET NO. C-4308**
                                   )
**RITE AID CORPORATION,**            )          **DECISION AND ORDER**
**a corporation.**                  )
_____  )

The Federal Trade Commission having initiated an investigation of certain acts and practices of the Respondent named in the caption hereof, and the Respondent having been furnished thereafter with a copy of a draft Complaint that the Bureau of Consumer Protection proposed to present to the Commission for its consideration and which, if issued by the Commission, would charge the Respondent with violation of the Federal Trade Commission Act, 15 U.S.C. § 45 et seq;

The Respondent, its attorney, and counsel for the Commission having thereafter executed an Agreement Containing Consent Order ("Consent Agreement"), an admission by the Respondent of all the jurisdictional facts set forth in the aforesaid draft Complaint, a statement that the signing of said Consent Agreement is for settlement purposes only and does not constitute an admission by Respondent that the law has been violated as alleged in such Complaint, or that the facts as alleged in such Complaint, other than jurisdictional facts, are true, and waivers and other provisions as required by the Commission's Rules; and

The Commission having thereafter considered the matter and having determined that it has reason to believe that the Respondent has violated the said Act, and that a Complaint should issue stating its charges in that respect, and having thereupon accepted the executed Consent Agreement and placed such Consent Agreement on the public record for a period of thirty (30) days, and having duly considered the comments filed thereafter by interested persons pursuant to Section 2.34 of its Rules, now in further conformity with the procedure described in Section 2.34 of its Rules, the Commission hereby issues its Complaint, makes the following jurisdictional findings and enters the following Order:

1.     Respondent Rite Aid Corporation is a Delaware corporation with its principal office or place of business at 30 Hunter Lane, Camp Hill, Pennsylvania 17011.

2.     The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and of the Respondent, and the proceeding is in the public interest.

## ORDER

### DEFINITIONS

For purposes of this order, the following definitions shall apply:

1.     Unless otherwise specified, "store" shall mean each pharmacy entity or store location that sells prescription medicines, drugs, devices, supplies, or services and/or non-prescription products and services.

2.     Unless otherwise specified, "LLC" shall mean a limited liability company: (a) that owns, controls, or operates one or more stores (including, but not limited to, the companies identified in attached Exhibit A), and (b) in which Rite Aid Corporation is a member, directly or indirectly.

3.     Unless otherwise specified, "Respondent" shall mean Rite Aid Corporation, its subsidiaries, divisions, affiliates, and LLCs, and its successors and assigns.

4.     "Personal information" shall mean individually identifiable information from or about an individual consumer including, but not limited to: (a) a first and last name; (b) a home or other physical address, including street name and name of city or town; (c) an email address or other online contact information, such as an instant messaging user identifier or a screen name; (d) a telephone number; (e) a Social Security number; (f) a driver's license number or other government-issued identification number; (g) prescription information, such as medication and dosage, and prescribing physician name, address, and telephone number, health insurer name, insurance account number, or insurance policy number; (h) a bank account, debit card, or credit card account number; (i) a persistent identifier, such as a customer number held in a "cookie" or processor serial number, that is combined with other available data that identifies an individual consumer; (j) a biometric record; or (k) any information that is combined with any of (a) through (j) above. For the purpose of this provision, a "consumer" shall include an "employee," and an individual seeking to become an employee, where "employee" shall mean an agent, servant, salesperson, associate, independent contractor, and other person directly or indirectly under the control of Respondent.

5.     "Commerce" shall mean as defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44.

## I.

**IT IS ORDERED** that Respondent, and its officers, agents, representatives, and employees, directly or through any corporation, subsidiary, limited liability company, division, or other device, in connection with the advertising, marketing, promotion, offering for sale, or sale of any product or service, in or affecting commerce, shall not misrepresent in any manner, expressly or by implication, the extent to which it maintains and protects the privacy, confidentiality, security, or integrity of personal information collected from or about consumers.

## II.

**IT IS FURTHER ORDERED** that Respondent, and its officers, agents, representatives, and employees, directly or through any corporation, subsidiary, limited liability company, division, or other device, in connection with the advertising, marketing, promotion, offering for sale, or sale of any product or service, in or affecting commerce, shall, no later than the date of service of this order, establish and implement, and thereafter maintain, a comprehensive information security program that is reasonably designed to protect the security, confidentiality, and integrity of personal information collected from or about consumers. Such program, the content and implementation of which must be fully documented in writing, shall contain administrative, technical, and physical safeguards appropriate to Respondent's size and complexity, the nature and scope of Respondent's activities, and the sensitivity of the personal information collected from or about consumers, including:

A.    the designation of an employee or employees to coordinate and be accountable for the information security program.

B.    the identification of material internal and external risks to the security, confidentiality, and integrity of personal information that could result in the unauthorized disclosure, misuse, loss, alteration, destruction, or other compromise of such information, and assessment of the sufficiency of any safeguards in place to control these risks. At a minimum, this risk assessment should include consideration of risks in each area of relevant operation, including, but not limited to: (1) employee training and management; (2) information systems, including network and software design, information processing, storage, transmission, and disposal; and (3) prevention, detection, and response to attacks, intrusions, or other systems failures.

C.    the design and implementation of reasonable safeguards to control the risks identified through risk assessment, and regular testing or monitoring of the effectiveness of the safeguards' key controls, systems, and procedures.

D.    the development and use of reasonable steps to select and retain service providers capable of appropriately safeguarding personal information they

3

receive from Respondent, and requiring service providers by contract to implement and maintain appropriate safeguards.

E.      the evaluation and adjustment of Respondent's information security program in light of the results of the testing and monitoring required by subpart C, any material changes to Respondent's operations or business arrangements, or any other circumstances that Respondent knows or has reason to know may have a material impact on the effectiveness of its information security program.

### III.

**IT IS FURTHER ORDERED** that, in connection with their compliance with Part II of this order, Respondent, and its officers, agents, representatives, and employees, shall obtain initial and biennial assessments and reports ("Assessments") from a qualified, objective, independent third-party professional, who uses procedures and standards generally accepted in the profession. The reporting period for the Assessments shall cover: (1) the first year after service of the order for the initial Assessment, and (2) each two (2) year period thereafter for twenty (20) years after service of the order for the biennial Assessments.  Each Assessment shall:

A.      set forth the specific administrative, technical, and physical safeguards that Respondent has implemented and maintained during the reporting period;

B.      explain how such safeguards are appropriate to Respondent's size and complexity, the nature and scope of Respondent's activities, and the sensitivity of the personal information collected from or about consumers;

C.      explain how the safeguards that have been implemented meet or exceed the protections required by the Part II of this order; and

D.      certify that Respondent's security program is operating with sufficient effectiveness to provide reasonable assurance that the security, confidentiality, and integrity of personal information is protected and has so operated throughout the reporting period.

Each Assessment shall be prepared and completed within sixty (60) days after the end of the reporting period to which the Assessment applies by a person qualified as a Certified Information System Security Professional (CISSP) or as a Certified Information Systems Auditor (CISA); a person holding Global Information Assurance Certification (GIAC) from the SysAdmin, Audit, Network, Security (SANS) Institute; or a qualified person or organization approved by the Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, Washington, D.C. 20580.

Respondent shall provide the initial Assessment to the Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, Washington, D.C. 20580, within ten

4

(10) days after the Assessment has been prepared. All subsequent biennial Assessments shall be retained by Respondent until the order is terminated and provided to the Associate Director for Enforcement within ten (10) days of request.

## IV.

**IT IS FURTHER ORDERED** that Respondent shall maintain and, upon request, make available to the Federal Trade Commission for inspection and copying:

A.      for a period of five (5) years, a print or electronic copy of each document relating to compliance, including, but not limited to, documents, prepared by or on behalf of Respondent, that contradict, qualify, or call into question Respondent's compliance with this order; and

B.      for a period of three (3) years after the date of preparation of each Assessment required under Part III of this order, all materials relied upon to prepare the Assessment, whether prepared by or on behalf of Respondent, including, but not limited to, all plans, reports, studies, reviews, audits, audit trails, policies, training materials, and assessments, and any other materials relating to Respondent's compliance with Parts II and III of this order, for the compliance period covered by such Assessment.

## V.

**IT IS FURTHER ORDERED** that Respondent Rite Aid Corporation shall deliver a copy of this order to all its current and future subsidiaries (including LLCs and each store that is owned, controlled, or operated by Respondent or an LLC), current and future principals, officers, directors, and managers, and to all current and future employees, agents, and representatives having responsibilities relating to the subject matter of this order. Respondent shall deliver this order to such current subsidiaries and personnel within sixty (60) days after service of this order, and to such future subsidiaries and personnel within sixty (60) days after the Respondent acquires the subsidiary or the person assumes such position or responsibilities.

## VI.

**IT IS FURTHER ORDERED** that Respondent shall notify the Commission at least thirty (30) days prior to any change in Respondent that may affect compliance obligations arising under this order, including, but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary (including an LLC), parent, or affiliate that engages in any acts or practices subject to this order; the proposed filing of a bankruptcy petition; or a change in Respondent's name or address. Provided, however, that, with respect to any proposed change in Respondent about which Respondent learns less than thirty (30) days prior to the date such action is to take place, Respondent shall notify the Commission as soon as is practicable after obtaining such knowledge. All notices required by this Part shall be sent by certified mail to the Associate Director, Division

5

of Enforcement, Bureau of Consumer Protection, Federal Trade Commission, Washington, D.C. 20580.

## VII.

**IT IS FURTHER ORDERED** that Respondent, and its successors and assigns, within sixty (60) days after the date of service of this order, shall file with the Commission a true and accurate report, in writing, setting forth in detail the manner and form of its compliance with this order.  Within ten (10) days of receipt of written notice from a representative of the Commission, it shall submit additional true and accurate written reports.

## VIII.

This order will terminate on November 12, 2030,  or twenty (20) years from the most recent date that the United States or the Federal Trade Commission files a complaint (with or without an accompanying consent decree) in federal court alleging any violation of the order, whichever comes later; provided, however, that the filing of such a complaint will not affect the duration of:

A.    Any Part in this order that terminates in less than twenty (20) years;

B.    This order's application to any Respondent that is not named as a defendant in such

complaint; and

C.    This order if such complaint is filed after the order has terminated pursuant to this Part.

Provided, further, that if such complaint is dismissed or a federal court rules that Respondent did not violate any provision of the order, and the dismissal or ruling is either not appealed or upheld on appeal, then the order will terminate according to this Part as though the complaint had never been filed, except that the order will not terminate between the date such complaint is filed and the later of the deadline for appealing such dismissal or ruling and the date such dismissal or ruling is upheld on appeal.

By the Commission.


                                                Donald S. Clark
                                                Secretary

SEAL
ISSUED:  November 12, 2010

6

# Exhibit B

*In the Matter of Rite Aid Corporation*, C-4308, 2010 Administrative Complaint

072-3121

# UNITED STATES OF AMERICA
# FEDERAL TRADE COMMISSION

COMMISSIONERS:       **Jon Leibowitz, Chairman**
                     **William E. Kovacic**
                     **J. Thomas Rosch**
                     **Edith Ramirez**
                     **Julie Brill**

| | |
|---|---|
| ) | |
| In the Matter of )| |
| ) | |
| **RITE AID CORPORATION,** ) | **DOCKET NO. C-4308** |
| a corporation. ) | |
| ) | |

# COMPLAINT

The Federal Trade Commission ("Commission"), having reason to believe that Rite Aid Corporation ("Respondent" or "Rite Aid") has violated the provisions of the Federal Trade Commission Act, and it appearing to the Commission that this proceeding is in the public interest, alleges:

1. Respondent Rite Aid is a Delaware corporation with its principal office or place of business at 30 Hunter Lane, Camp Hill, PA 17011. It conducts business through several wholly-owned subsidiaries and limited liability companies.

2. The acts and practices of Respondent as alleged in this complaint are in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act.

## RESPONDENT'S BUSINESS

3. At all relevant times, Respondent has been in the business of selling prescription and non-prescription medicines and supplies, as well as other products. It operates, among other things, approximately 4,900 retail pharmacy stores in the United States (collectively, "Rite Aid pharmacies") and an online pharmacy business. Respondent allows consumers to pay for their purchases with credit, debit and electronic benefit transfer cards (collectively, "payment cards"); insurance cards; personal checks; or cash.

4. In conducting its business, Respondent routinely obtains information from or about its customers, including, but not limited to, name; telephone number; address; date of birth;

1

bank account number; payment card account number and expiration date; prescription information, such as medication and dosage, prescribing physician name, address, and telephone number, health insurer name, and insurance account number and policy number; and Social Security number (collectively, "personal information"). Respondent also collects personal information from or about employees and job applicants, including, but not limited to, Social Security number.

5.     Respondent operates computer networks in its pharmacies, corporate headquarters, and distribution centers. Among other things, Respondent uses the networks to fill orders for prescription medicines and supplies; process sales, including to obtain authorization for payment card and insurance card transactions; and aggregate, store, and transmit personal information.

## RESPONDENT'S REPRESENTATIONS

6.     Respondent has disseminated or caused to be disseminated statements and privacy policies to consumers regarding the privacy and confidentiality of personal information, including, but not limited to:

    a.     From at least 2003, the following statement in its Notice of Privacy Practices:

> Rite Aid takes its responsibility for maintaining your protected health information in confidence very seriously. Protected health information means information about you that may identify you and that relates to your past, present or future physical or mental health or condition and related health care services. It also includes basic demographic information. We are required by law to maintain the privacy of protected health information and to provide you with a Notice of Privacy Practices including our legal duties with respect to protected health information. (*See* Exhibit A).

    b.     From at least 2004, the following statement in a brochure seeking its customers' medical history:

> Although you have the right not to disclose your medical history, Rite Aid would like to assure you that we respect and protect your privacy. (*See* Exhibit B.)

## RESPONDENT'S SECURITY PRACTICES

7.     Respondent has engaged in a number of practices that, taken together, failed to provide reasonable and appropriate security for personal information. Among other things, Respondent has failed to: (1) implement policies and procedures to dispose securely of such information, including, but not limited to, policies and procedures

2

to render the information unreadable in the course of disposal; (2) adequately train employees to dispose securely of such information; (3) use reasonable measures to assess compliance with its established policies and procedures for the disposal of such information; and (4) employ a reasonable process for discovering and remedying risks to such information.

8.  As a result of the failures set forth in Paragraph 7, Respondent discarded materials containing personal information in clear readable text (such as pharmacy labels and employment applications) in unsecured, publicly-accessible trash dumpsters used by Rite Aid pharmacies on numerous occasions. For example, in late 2006 and continuing into 2007 and 2008, television stations and other media outlets reported finding personal information in unsecured dumpsters used by Rite Aid pharmacies in at least 7 cities throughout the United States. The personal information found in the dumpsters included information about Respondent's customers and job applicants. Information discarded in publicly-accessible dumpsters could be misused to commit identity theft or to steal prescription medicines.

## VIOLATIONS OF THE FTC ACT

9.  Through the means described in Paragraph 6, Respondent represented, expressly or by implication, that it implemented reasonable and appropriate measures to protect personal information against unauthorized access.

10. In truth and in fact, Respondent did not implement reasonable and appropriate measures to protect personal information against unauthorized access. Therefore, the representation set forth in Paragraph 9 was, and is, false or misleading.

11. As set forth in Paragraph 7, Respondent failed to employ reasonable and appropriate measures to prevent unauthorized access to personal information. Respondent's practices caused, or are likely to cause, substantial injury to consumers that is not offset by countervailing benefits to consumers or competition and is not reasonably avoidable by consumers. This practice was, and is, an unfair act or practice.

12. The acts and practices of Respondent as alleged in this complaint constitute unfair or deceptive acts or practices, in or affecting commerce, in violation of Section 5(a) of the Federal Trade Commission Act.

**THEREFORE**, the Federal Trade Commission this twelfth day of November, 2010 has issued this complaint against Respondent.

By the Commission.

Donald S. Clark
Secretary

3

# Exhibit C

Example Rite Aid Assessment Form

# Rite Aid
# Ongoing Vendor Risk Assessment

**Vendor Name:**

▮▮▮▮▮▮▮▮▮▮

1. Vendor Questionnaire- Sent to vendor

2. Vendor Questionnaire- Returned from vendor

3. Risk Assessment (High/Medium/Low)

4. Vendor security assessments received (SSAE16. Etc.)    None

5. Risk Analyst    X.

6. VP & CISO    X.

7. Ongoing risk assessment required?

8. Next Assessment

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Federal Trade Commission

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attachment

## DEFENDANTS

Rite Aid Corporation, and Rite Aid Hdqtrs. Corp.

County of Residence of First Listed Defendant _Philadelphia County_
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

See attachment

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [x] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| [ ] 140 Negotiable Instrument | Liability | [ ] 367 Health Care/ | | **INTELLECTUAL** | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted | Liability | [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated | [ ] 460 Deportation |
| Student Loans | [ ] 340 Marine | Injury Product | | New Drug Application | [ ] 470 Racketeer Influenced and |
| (Excludes Veterans) | [ ] 345 Marine Product | Liability | | [ ] 840 Trademark | Corrupt Organizations |
| [ ] 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | [ ] 371 Truth in Lending | Act | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | Product Liability | [ ] 380 Other Personal | [ ] 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal | Property Damage | Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury | [ ] 385 Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury - | Product Liability | [ ] 751 Family and Medical | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | [ ] 864 SSID Title XVI | [x] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 791 Employee Retirement | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate | | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/ | Sentence | | or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - | [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | [ ] 462 Naturalization Application | | Agency Decision |
| | [ ] 446 Amer. w/Disabilities - | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| | Other | [ ] 550 Civil Rights | Actions | | State Statutes |
| | [ ] 448 Education | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 13(b) of the FTC Act, 15 U.S.C. § 53(b)

Brief description of cause:
Unfair acts or practices through (1) use of facial recognition technology and (2) failure to implement or maintain information security program

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE: Dec 19, 2023

SIGNATURE OF ATTORNEY OF RECORD: /s/ Robin L. Wetherill

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## ATTACHMENT TO CIVIL COVER SHEET

**Plaintiff's Attorneys**

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
Robin L. Wetherill; Tel: (202) 326-2220; rwetherill@ftc.gov
Leah Frazier; Tel: (202) 326-2187; lfrazier@ftc.gov
N. Diana Chang; Tel: (415) 848-5192; nchang@ftc.gov
Christopher J. Erickson; Tel: (202) 326-3671; cerickson@ftc.gov
Brian M. Welke; Tel: (202) 326-2897; bwelke@ftc.gov

**Defendants' Attorneys**

HOLLAND & KNIGHT LLP
800 17th Street N.W.
Suite 1100 Washington, D.C. 20006
Anthony E. Diresta; Tel: (202) 469-5164; Anthony.DiResta@hklaw.com
Mark S. Melodia; Tel: (212) 513-3583; Mark.Melodia@hklaw.com

KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave. N.W.
Washington D.C. 20004
Richard H. Cunningham; Tel: (202) 389-3119; Richard.Cunningham@kirkland.com
Allison W. Buchner; Tel: (310) 552-4302; Allison.Buchner@kirkland.com

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

*(to be used by counsel to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: ___600 Pennsylvania Avenue, N.W., Washington, D.C. 20580_____

Address of Defendant: ___1200 Intrepid Avenue, 2nd Floor, Philadelphia, PA 19112_____

Place of Accident, Incident or Transaction: ___Nationwide_____

---

*RELATED CASE IF ANY:*

Case Number:_____ Judge:_____ Date Terminated_____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?     Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit Pending or within one year previously terminated action in this court?     Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier Numbered case pending or within one year previously terminated action of this court?     Yes ☐   No ☒

4. Is this a second or successive habeas corpus, social security appeal, or pro se case filed by the same individual?     Yes ☐   No ☒

I certify that, to my knowledge, the within case ☐ **is** / ☒ **is not** related to any now pending or within one year previously terminated action in this court except as note above.

DATE:  12/19/2023     /s/ Robin L. Wetherill_____     n/a (federal agency) (CA Bar No. 323912)

      *Attorney-at-Law* <span style="color:red">*(Must sign above)*</span>       *Attorney I.D. # (if applicable)*

---

**Civil (Place a √ in one category only)**

*A.* *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Wage and Hour Class Action/Collective Action
☐ 6. Patent
☐ 7. Copyright/Trademark
☐ 8. Employment
☐ 9. Labor-Management Relations
☐ 10. Civil Rights
☐ 11. Habeas Corpus
☐ 12. Securities Cases
☐ 13. Social Security Review Cases
☐ 14. Qui Tam Cases
☒ 15. All Other Federal Question Cases. *(Please specify):*__Federal Trade Commission Act__

*B.* *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):*_____
☐ 7. Products Liability
☐ 8. All Other Diversity Cases: *(Please specify)*_____
_____

---

**ARBITRATION CERTIFICATION**

*(The effect of this certification is to remove the case from eligibility for arbitration)*

I, _Robin Wetherill_____, counsel of record *or* pro se plaintiff, do hereby certify:

☐   Pursuant to Local Civil Rule 53.2 § 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☒   Relief other than monetary damages is sought.

DATE: _12/19/2023_____     /s/ Robin L. Wetherill_____     n/a (federal agency) (CA Bar No. 323912)

      *Attorney-at-Law* <span style="color:red">*(Sign here if applicable)*</span>       *Attorney ID # (if applicable)*

NOTE: A trial de novo will be a jury only if there has been compliance with F.R.C.P. 38.

# **EXHIBIT C**

## **Motion to Stay**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

RITE AID CORPORATION, a corporation,

and

RITE AID HDQTRS. CORP., a corporation,

Defendants.

**Case No. 2:23-cv-5023**

### JOINT MOTION FOR STAY

Plaintiff Federal Trade Commission ("FTC" or "Commission") and Rite Aid Corporation

and Rite Aid Hdqtrs. Corp. (collectively, "Defendants," and together with the FTC, the

"Parties"), by and through undersigned counsel, have reached an agreement resolving this

matter.  As a result, the Parties respectfully move this Court to stay this action for 45 days or

until they obtain Bankruptcy Court approval of the settlement agreement between them,

whichever is earlier.  Should the Bankruptcy Court approve the settlement within 45 days, the

FTC and Defendants will file a separate motion in this Court seeking (1) to lift the stay and (2)

for entry of the Stipulated Order for Permanent Injunction and Other Relief ("Stipulated Order,"

attached as **EXHIBIT A**).[1]

### BACKGROUND

On December 19, 2023, the FTC filed a Complaint pursuant to Section 13(b) of the

---

[1] If the Bankruptcy Court does not approve the settlement within 45 days, the Parties will file a
joint status report notifying the Court of the status of the effort to seek Bankruptcy Court
approval.

Federal Trade Commission Act, 15 U.S.C. § 53(b), alleging that the Defendants engaged in

unfair and deceptive business practices in violation of the FTC Act.  The FTC seeks a permanent

injunction to prevent continuation of the conduct at issue and to prevent similar and related

conduct in the future.  The Defendants have reached a settlement with the FTC, as set forth in the

Stipulated Order.

Defendants filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code on

October 15, 2023.  The cases are being jointly administered under *In re Rite Aid Corporation*,

Case No. 3:23-bk-18993 (Bankr. D.N.J.).

## ARGUMENT

Defendants have reached a settlement with the FTC that will resolve this litigation.

However, because Defendants are in bankruptcy proceedings, they must obtain approval of the

settlement by the Bankruptcy Court under Bankruptcy Rule 9019.  Defendants intend to file a

motion in the Bankruptcy Court by no later than January 3, 2024, seeking approval of the

Stipulated Order.

To allow the Bankruptcy Court time to consider the motion and, in its discretion, hold a

hearing, the FTC and Defendants request that the Court stay this action as to the Defendants for

45 days or until the Bankruptcy Court approves the Stipulated Order, whichever is earlier.

Should the Bankruptcy Court approve the settlement within 45 days, the FTC and Defendants

will file a separate motion seeking entry of the Stipulated Order by this Court.


Dated: December 19, 2023

Respectfully submitted,

**FOR PLAINTIFF:** FEDERAL TRADE COMMISSION

/s/ Robin L. Wetherill
Robin L. Wetherill, CA Bar No. 323912
Leah Frazier, DC Bar No. 492540
N. Diana Chang, CA Bar No. 287624
Christopher J. Erickson, MD Bar No. 1712130163
Brian M. Welke, DC Bar No. 1017026
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
Phone: (202) 326-2220 (Wetherill); -2187 (Frazier)
-3671 (Erickson); -2897 (Welke);
(415) 848-5192 (Chang)
rwetherill@ftc.gov
lfrazier@ftc.gov
nchang@ftc.gov
cerickson@ftc.gov
bwelke@ftc.gov

**FOR DEFENDANTS:**

/s/ Mark S. Melodia

MARK S. MELODIA (PA Bar Number 53515)
Holland & Knight LLP
1650 Market Street
Suite 3300
Philadelphia, PA 19103
(215) 252-9600
Mark.Melodia@hklaw.com

ANTHONY E. DIRESTA (DC Bar No. 464362)
Holland & Knight LLP
800 17th Street N.W.
Suite 1100
Washington, D.C. 20006
(202) 955-3000
Anthony.DiResta@hklaw.com

RICHARD H. CUNNINGHAM (DC Bar No. 1644119)
Kirkland & Ellis LLP
1301 Pennsylvania Ave. N.W.
Washington D.C. 20004
(202) 389-3119
Richard.Cunningham@kirkland.com

ALLISON W. BUCHNER (CA Bar No. 253102)
Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
(310) 552-4302
Allison.Buchner@kirkland.com

4

**Local Rule 7.1(b) Certificate of Uncontested Motion**

Pursuant to L.R. 7.1(b), the undersigned hereby certifies that the above motion is

uncontested.  All counsel whose /s/ signature appears on the forgoing document have consented

to the use of their /s/ signature.

Dated: December 19, 2023                    /s/  Robin L. Wetherill
                                            Robin L. Wetherill
                                            Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing and all related documents have been filed electronically and are available for viewing and downloading from the ECF system for this Court.  Additionally, on December 19, 2023, a true and correct copy of the foregoing and all related documents were served on all counsel of record for Rite Aid Corporation and Rite Aid Hdqtrs. Corp.  These documents were sent by email to counsel at the email addresses listed below, pursuant to their written agreement:

1) Anthony DiResta at Anthony.DiResta@hklaw.com
2) Mark Melodia at Mark.Melodia@hklaw.com
3) Richard Cunningham at Richard.Cunningham@kirkland.com
4) Allison Buchner at Allison.Buchner@kirkland.com

/s/  Robin L. Wetherill
Robin L. Wetherill